NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

REEVES BROADCASTING & DEVELOPMENT CORPORATION (WHTN–TV), Respondent.

No. 9164.

United States Court of Appeals Fourth Circuit.

Argued Jan. 15, 1964.

Decided July 31, 1964.

Melvin Pollack, Atty., N. L. R. B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Morton Namrow, Atty., N. L. R. B., on brief), for petitioner.

C. Robert Schaub, Huntington, W. Va., for respondent.

Before HAYNSWORTH, BOREMAN and BRYAN, Circuit Judges.

ALBERT V. BRYAN, Circuit Judge.

Unfair labor practices by Reeves Broadcasting & Development Corporation (WHTN–TV) were found by the National Labor Relations Board and it now seeks enforcement of its order imposing sanctions for the offending conduct. Specifically, the misconduct consisted of interference, restraint and coercion of employees in the exercise of their right to bargain collectively and join a union, discouragement of union membership and refusal to bargain in good faith with representatives of the employees. National Labor Relations Act, § 8(a) (1), (5) and (3), 29 U.S.C. § 158(a) (1), (5) and (3). We confirm the findings of § 8(a) (1) violations; we see no ground for condemning the bargaining as wanting in good faith.

Reeves operates several television stations, including the one presently involved at Huntington, West Virginia. The charging union is the National Association of Broadcast Employees and Technicians, AFL–CIO. An election was held on June 13, 1961 to choose a bargaining agent. Before the election the vice president and general manager of the station, Myers, told employees Hamer, Jones and Barton, vice president of the Union's local, that "no intelligent person would need an outsider [the Union] from Buffalo to come down and bargain". He suggested, too, that the employees could do very well by themselves.

After the election, won by the Union, Myers on June 14, 1961 issued a memorandum to the effect that there was to be no discussion of union activities "on Company time, or on the premises of WHTN–TV". Following the certification of the Union on June 21, 1961, Production Manager Robert Hamlin assert-

edly told employee Mays that Reeves had no intention of signing a contract but would await the expiration of a year for another election when the Union would be voted out.

Operations Manager Davis said in effect, when the bargaining sessions began on August 23, 1961 and in talking of the Union's first proposal, that management had found an efficient way to operate and it would continue in that way irrespective of negotiation and regardless of contract.

From the first meeting on August 23 to the one on November 16, 1961, the last before the strike was voted, the major issues were union security, work jurisdiction, seniority, overtime, wages and grievance procedure. No agreement was reached. Both parties offered proposals and counter proposals throughout the period, but a strike was voted on November 18. On that day Manager Davis asked employee McClure if he intended to go to the Union meeting that night which had been called to consider the strike. When McClure replied he was not going to the meeting, Davis directed him to attend and report the results. The meeting was over when McClure arrived and the strike had been agreed upon. McClure, so informed Hamlin, who observed that it would mean immediate discharges, that Reeves would starve the strikers out until a new vote could be taken.

Davis asked McClure on November 26 whether he would cross the picket line in the event of a strike. In response McClure inquired if Reeves would sign a contract. Davis' reply was that Reeves had no intention of ever signing a contract, at the same time warning McClure that if he went on strike he would be replaced. He observed to McClure that as 1 of 11 employees he was due for an increase of salary but would not get it because the Union would act for all of the employees. He assured McClure that "if it is the money situation, we will give you a hundred or a hundred-fifteen, or you name it", at the same time assuring McClure that he need not worry about the safety of his family during the strike, for Reeves would take care of sending them away. On the same day Davis told Workman, a part-time employee, that he could have a full-time job if he came across the picket line.

On November 29 Manager Myers called Maddox, president of the Union's local and a negotiator, for a conference of about three hours. At this time Myers said the Union was getting out of hand, that he would like to get rid of it, that he needed a Company union which would give the employees all the Union could offer and no dues would be required. He requested Maddox as "the leader of the Union people" to discuss the suggestion with the employees and use his efforts to pursuade them to supplant the Union with a Company organization.

On December 4 the Union filed a charge against Reeves for refusal to bargain and on December 6 the employees struck. Contract negotiations were resumed on December 21, with the strike in progress. At this meeting Reeves indicated it would make some concessions on grievance, overtime and seniority. Nothing was accomplished because the Union advanced the question of the strikers' reinstatement without loss of pay or seniority. This proposal the Company declined. On January 25 the Union made an unconditional offer on behalf of the strikers to return to work. It was not acceptable to Reeves and the strikers were not reinstated until March, 1962.

The conduct and statements just related comprise the findings of the Examiner. They constituted, he thought, coercion and other practices forbidden by § 8(a) (1). However, he concluded that from the first meeting until the strike became effective on December 6, 1961 it could not be said that the Company had not bargained in good faith, but that after that date it had failed to do so. The strike in his opinion was the result of unfair labor practices consisting of the 8(a) (1) breaches.

The Board adopted the Examiner's findings but enlarged them by holding

that the Company's failure to bargain in good faith existed from the inception of the negotiations. Thereupon it declared that Reeves had violated § 8(a) (3) and (1) by refusing to reinstate the strikers on January 25 when they offered to come back. An order was entered requiring Reeves to cease and desist from this stand. It also directed Reeves to bargain with the Union, to recall the no-solicitaion rule and to pay the strikers for lost wages with interest from January 25, the date of the offer to return, until March 5, 1962, when they were reaccepted.

Certainly, we think, no want of actual bargaining on the part of the Company is evident in this record. Absence of good faith is asserted by adverting to the statements of General Manager Myers, Operations Manager Davis, and Production Manager Hamlin. Canvassing their behavior, we find no ground for the conclusion either that it injected a lack of good faith into the consultations with the Union, or that it reasonably provoked the strike.

However, with certain exceptions, the remarks of Hamlin, Davis and Myers are not excusable. The Board was right in treating them as coercive, interfering and discouraging within the intendment of the Act. We shall note the exceptions as well as the circumstances revealing that the other instances were not indicative of bad faith or causative of the strike.

Myers' memorandum forbidding Union discussions during Company time was clearly permissible. Questionable only is the finding of illegality in the use of Company premises for the purpose in light of the "special" or "unusual" circumstances. Republic Aviation Corp. v. NLRB, 324 U.S. 793, 803 n. 10, 65 S.Ct. 382, 89 L.Ed. 1372 (1945). The evidence establishes that telecasting demands unrelieved attention and constant application in order to maintain "split-second" timing. There can be, and there were, no lapses in presenting programs. Then, too, there was no spare physical space for free time discussions. A group

so engaged would have interefered with station operation. Available just across the street were the Union headquarters, and nearby a restaurant patronized by the employees and always open to them.

To be considered, too, is that the memorandum was not issued until after the election and so was not an influencing factor there. If this notice was not allowable under the circumstances outlined, clearly it did not evince a want of good faith in negotiations two months subsequently, or contribute to the strike almost six months later.

The statement of General Manager Myers prior to the election that an intelligent person would not need an outsider to bargain for him, and that the employees could do very well for themselves was surely nothing more than an open and candid exercise of the right of free speech permitted by the Act, § 8(c)—particularly so, since he was addressing a vice president of the local.

The conversation between Manager Myers and Maddox on November 29 in regard to a Company union was certainly not unlawful. Maddox was president of the Union's local and one of the negotiators. He was the proper person for Myers to engage about any grievance with the Union. Myers knew of Maddox' position and he was not barred from expressing his judgment to an adversary representative. § 8(c).

Even the "totality" of these statements does not evince such lack of good faith as to give that cast to the negotiations, which in the mind of the Examiner *were* in good faith and, in the eyes of the Board, *appeared* to be in good faith. At best, the statements were solely violations of § 8(a) (1). As their content, context and isolation also demonstrate, they did not warrant the finding that they had caused the strike. The evidence reveals it was no more than an economic walkout.

The directions of the Board requiring cessation and desistence of all coercion, restraint and interference will be enforced. To the extent the strikers

were not replaced they should have been reemployed when they applied, and they are entitled to the payment of wages, with interest, from January 25, 1962 until their reinstatement. Orders to this end will be enforced, as will the requirement of the posting of notices thereof.

Order enforced in part, refused in part.