CHEVRON OIL COMPANY, STANDARD
OIL COMPANY OF TEXAS DIVISION,
Petitioner-Cross Respondent,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent-Cross
Petitioner.

No. 29789.

United States Court of Appeals,
Fifth Circuit.

May 4, 1971.

John B. Abercrombie, William R. D'Armond, Samuel E. Hooper, Houston, Tex., for Petitioner Chevron Oil Co., Western Division; Baker, Botts, Shepherd & Coates, Houston, Tex., of counsel.

Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., Washington, D. C., Elmer P. Davis, Director, Region 16, N. L.R.B., Fort Worth, Tex., Charles N. Steele, Asst. Gen. Counsel, Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Herman M. Levy, Atty., N.L.R.B., Washington, D. C., for respondent.

Before WISDOM, THORNBERRY and DYER, Circuit Judges.

THORNBERRY, Circuit Judge:

This case is before the Court on petition to review and set aside and cross-application to enforce an order of the National Labor Relations Board. The Board concluded that Petitioner, Chevron Oil Company, Standard Oil Company of Texas Division,[1] had refused in violation of § 8(a) (5) [2] of the National Labor Relations Act (the Act), 29 U.S.C.A. § 158(a) (5), to bargain in good faith with Respondent, Local 826, International Union of Operating Engineers, AFL–CIO. In addition, the Board determined that Chevron interfered with, restrained and coerced its employees in violation of § 8 (a) (1) of the Act, 29 U.S.C.A. § 158(a) (1),[3] and that the Company violated § 8(a) (1) and (3) [4] of the Act, 29 U.S. C.A. § 158(a) (1) and (3), by withholding wage increases from the bargaining unit represented by the Union.

The instant controversy began when the International Union of Operating Engineers, AFL–CIO was certified on October 28, 1966 as the collective bargaining representative of the production and maintenance workers employed at the Snyder, Texas plant of Chevron Oil Company, Standard Oil of Texas Division. Thereafter the Union submitted a contract proposal, and Chevron responded with a counter-proposal. Although the parties engaged in bargaining sessions over an eleven-month period,[5] they were unable to negotiate a contract acceptable to both sides. During the course of the negotiations, the Union filed the unfair labor practice charges enumerated in the initial paragraph of this opinion. Following a hearing the Trial Examiner found that Chevron had refused to bargain in good faith with the Union on and after January 31, 1967, and that by the statements of a supervisor, Chevron had interfered with its employees' rights. Accordingly, the Trial Examiner ordered the Company to cease and desist refusing to bargain with the Union and interfering with its employees' rights. A three-

---

1. Standard Oil Company of Texas is a division of Chevron Oil Company, a California corporation wholly owned by Standard Oil Company of California.

2. 29 U.S.C.A. § 158(a) (5) provides:
   (a) It shall be an unfair labor practice for an employer—
   * * * (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of [section setting out specific rights and obligations].

3. 29 U.S.C.A. § 158(a) (1) provides:
   (a) It shall be an unfair labor practice for an employer—
   (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [section providing for collective bargaining].

4. 29 U.S.C.A. § 158(a) (3) provides:
   (a) It shall be an unfair labor practice for an employer—
   * * * (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization * * *.

5. Bargaining sessions were held on the following dates: December 14, 1966; January 17, 18, 30 and 31, 1967; March 23, 1967; May 16, 1967; June 7 and 27, 1967; August 22, 1967; December 7, 1967; and January 10, 1968.

member panel of the Board, while substantially ratifying the findings, conclusions and recommendations of the Trial Examiner, modified the Examiner's report in two aspects: (1) It found that the Company had failed to negotiate in good faith on and after December 16, 1966; and (2) it determined that since Chevron's withholding of wage increases interfered with its employees' rights, the employees should be made whole for the losses they sustained. The Board adopted the Trial Examiner's order with the additional requirement that Chevron make whole the employees in the unit for the monetary losses they suffered as a result of the Company's withholding action. Chevron filed its petition for review; the Board answered and filed a cross-application for enforcement.

In considering the petition for review our task is to measure the Board's conclusions against the substantial evidence standard: We must enforce the Board's conclusions if they find "support in the record as a whole * * * 'even though the court would justifiably have made a different choice had the matter been before it de novo.' " N.L.R.B. v. Fant Milling Co., 360 U.S. 301, 309, note 10, 79 S.Ct. 1179, 1184, 3 L.Ed.2d 1243, 1249 (1959), enforced on remand, 5th Cir. 1959, 272 F.2d 773; N.L.R.B. v. Herman Sausage Co., 5th Cir. 1960, 275 F.2d 229, 231. We therefore carefully examine the evidence, mindful that the Board must begin with the presumption that the parties were conducting themselves in good faith in accordance with the dictates of the law, and that the burden of proving unlawful conduct is borne by the General Counsel for the Board. The Board is permitted, of course, to draw inferences from the evidence. Before the inferences are entitled to acceptance by this Court, however, they must be founded upon proved facts, not upon speculation or suspicion. *See, e. g.,* N.L.R.B. v. Alva Allen Industries, Inc., 8th Cir. 1966, 369 F.2d 310; N.L.R.B. v. Murray Ohio Manuf. Co., 6th Cir. 1964, 326 F.2d 509; N.L.R.B. v. Putnam Tool Co., 6th Cir. 1961, 290 F.2d 663; N.L.

R.B. v. F. H. McGraw & Co., 6th Cir. 1953, 206 F.2d 635; N.L.R.B. v. Sheboygan Chair Co., 7th Cir. 1942, 125 F.2d 436.

## I.

### § 8(a) (1) Charge: Coercion of Employees

■ During the "happy hour" of a Company awards dinner on December 6, 1967, Charles Kirkvold, Chevron's production superintendent for the Snyder division, engaged in conversation with two employees. The Board found that Kirkvold stated, in essence, that the Company was compelled to take a hardnosed attitude toward the Union employees at the Snyder plant and that if the employees would vote the Union out some changes would be made. When one of the employees stated that voting the Union out would be tantamount to losing their jobs, Kirkvold replied that he would guarantee they would retain their jobs. The Board concluded that Kirkvold's statements were violative of § 8(a) (1). We believe there is substantial evidence in the record to support the Board's finding. Accordingly, we enforce the Board's order as to this violation.

## II.

### § 8(a) (5) Charge: Refusal to Bargain in Good Faith

In determining that Chevron was committed to, and utilized, a purposeful bargaining strategy designed to hamper the Union's performance of its representative functions and to undermine the Union in the eyes of its employees as an effective collective-bargaining agent, the Board attached particular significance to the following factors: (a) The Company's alleged display of hostility toward the Union during the pre-election period; (b) the Company's delays subsequent to the election in scheduling bargaining meetings and in furnishing certain information to the Union; (c) the statements made by Kirkvold at the December 6, 1967, awards dinner; (d) Chevron's refusal "to consider any contract which

did not contain onerous restrictions on union rights as evidenced by its insistence upon the combined inclusion of 'management rights' provisions, a rigid no-strike clause, and no resort to arbitration"; and (e) the Company's continued rejection of Union proposals. We discuss these factors—the underpinnings of the Board's decision—in sequence.

(a) Chevron's pre-election campaign.

■ Prior to the October 20, 1966, representation election, D. T. Magee, Chevron's production superintendent [6] for the district within which the Snyder plant is located, purported, in a series of oral and written communications to the employees, to state the Company's position vis a vis the Union. The Board concluded that Chevron, through Magee, had displayed an "unmistakable aversion" to the Union. Although the Board did not suggest that the campaign itself constituted an unfair labor practice, it determined, contrary to the Trial Examiner's finding, that the Company's pre-election attitude and conduct toward the Union was an indicia of bad faith in subsequent contract negotiations. We disagree. A canvass of the pre-election communications leaves us with the firm conviction that Chevron's production superintendent conducted an active campaign to defeat the Union, and that it was clear to the employees that the Company preferred them to remain unorganized. The Company was entitled, however, to its own opinion. The mere fact that it enunciated its stance does not, in itself, create a presumption of bad faith bargaining during later contract negotiations. We note that the superintendent did not state that the Company would not negotiate in good faith with the Union. To the contrary, he specifically told the employees, "The Company does not feel that a Union would be in the best interests of the employees. We believe that the Company can do more for you without a Union, *although if the majority of you vote for the Union the Company will bar-*

*gain in good faith with the Union on your wages, hours, and working conditions."* (Emphasis supplied). We believe, as did the Trial Examiner, that the evidence simply does not justify the inference that the Company, once the election results had been announced, was not prepared to accept and deal in good faith with Local 826 as the employees' agent. *See* N.L.R.B. v. Reeves Broadcasting & Development Corp., 4th Cir. 1964, 336 F. 2d 590. *See also* Acme Products, Inc. v. N.L.R.B., 8th Cir. 1968, 389 F.2d 104; Dierks Forests, Inc. v. N.L.R.B., 8th Cir. 1967, 385 F.2d 48; N.L.R.B. v. Murray Ohio Mfg. Co., *supra.*

(b) Chevron's delay in furnishing information to and commencing negotiations with the Union.

■ Local 826 was certified as the employees' bargaining agent on October 20, 1966. By letter dated November 8, Frank Parker, Local 826's business manager, requested Magee to furnish the Union with information concerning pensions and insurance benefits, classification and pay rates, and paid vacation, holiday, and leave policies then in effect. He also indicated that the Union was ready to begin negotiations after November 20 and asked to be advised of dates available to the Company for meetings. On November 21, 1966, Parker replied that Company representatives would be prepared to meet on December 13, 14 or 15, and stated that "[a]t this time we can begin to discuss the information requested in your letter of November 8, 1966." Parker, by letter of November 28, suggested that the first meeting be held on December 14; Magee agreed. On December 2, Parker reiterated his request for the information. Magee, by letter dated December 6, supplied a portion of the information, explaining that the rest required considerable explanation that would be forthcoming in the December 14 meeting. Parker made no reply. At the meeting Parker presented a comprehensive contract proposal on behalf of Local 826. After the provi-

---

6. On January 1, 1967, D. T. Magee was replaced as district superintendent and as a member of the Company's negotiating team by Charles Kirkvold.

sions had been read and clarified, the meeting ended with the understanding that the Company representatives would contact the Union with regard to a date for the second session. By letter dated December 27, Magee informed Parker that the Company would be available for a two-day meeting commencing at 10:00 a. m. on January 10, 1967. Parker agreed to the dates but stated that the Union had hoped to meet at an earlier date. The meeting was later rescheduled for January 17 at the Company's request.[7]

The Board found that in the period chronicled above the Company and its negotiators, in setting bargaining dates and providing information, resorted to delay and procrastination to an extent justifying the inference that the Company was refusing to bargain in good faith. We do not agree. It is true that the Company did not immediately comply with the Union's request for information. We are unable to conclude, however, that substantial evidence supports the inference that the delay was an intentional Company strategy designed to frustrate the Union's bargaining effort. Rather, we believe the evidence indicates the delay was the product of a misunderstanding to which both parties contributed. In his November 21 letter to Parker, Magee specifically stated that the requested information would be discussed and explained at the first meeting. Parker, in his reply to the November 21 correspondence, failed to express an objection to the Company's position and thus conveyed the impression that the Union was in agreement with it. Accordingly, the Company took no further action until it received Parker's December 2 letter reiterating the request for information. Chevron then supplied the portion of the requested information that did not require substantial explanation. The Union received the information in

sufficient time to prepare its proposals before the December 14 meeting and made no further objections in regard to the request. The Company's conduct, when considered in context, is not indicative of an intention to bargain in bad faith.

The month's delay between the meetings on December 14 and January 17 is regrettable, but after considering it in light of contemporaneous events, we do not believe it constitutes evidence that Chevron refused to bargain in good faith. In November, December and early January Chevron was deeply involved in the negotiations that ultimately settled the terms of the nationwide oil industry contract. Ed Johannessen, the Company's primary negotiator during the Snyder sessions, was participating in negotiations with unions in San Francisco and Los Angeles in addition to compiling a counter-proposal to Local 826's proffered contract.[8] The Christmas-New Year season contributed to the delay, as did a change in personnel of the Company team negotiating the Snyder contract. In sum, we can accuse the Company of having too many irons in the fire during the time in question, but we cannot conclude that it pursued a deliberate course of delay.

(c) The awards dinner incident.

The Board found, and we agree,[9] that Kirkvold's statements to two employees at the awards dinner were violative of § 8(a) (1). We find ourselves in disagreement, however, with the Board's determination that the statements justify an inference that the Company engaged in bad faith bargaining. We note that Kirkvold's remarks were made a year after negotiations commenced and at a time when they were virtually at a standstill. Moreover, the incident was an isolated one. When viewed against the

---

7. The Company stated, *inter alia,* that Kirkvold, who had replaced Magee in the negotiations, would be unable to attend the session if it were held on the originally scheduled date.

8. Johannessen was only one of eight negotiators employed in Standard Oil of California's headquarters, but all eight were busy during the period in question. According to Johannessen's uncontradicted testimony the negotiators were involved in closing twenty to thirty contracts during this period.

9. See Part I of text.

complete backdrop of negotiations the incident has small import and does not impute bad faith to the Company's bargaining effort.

(d) Chevron's insistence on certain provisions; and (e) Chevron's rejection of Union proposals.

At the first bargaining session Local 826 submitted a proposed contract. Chevron responded with its own proposals at the second session. During the subsequent meetings the parties were able to reach several areas of agreement through mutual concessions. It soon became apparent, however, that Chevron would insist the contract include a broad management rights clause, a no-strike provision, and a grievance procedure that did not provide for arbitration.[10] The Company's position on these proposals was unacceptable to the Union. In its counter-proposals the Union indicated a willingness to move closer to the Company's position if the Company in turn would yield some ground. The Company, maintaining its insistence on the provisions, rejected the Union's proffered proposals and concessions. From Chevron's adamant insistence on the provisions and its continued rejection of the Union's proposals the Board culled an inference of bad faith.

As legal justification for its bargaining attitude and conduct Chevron relies upon National Labor Relations Board v. American National Insurance Company, 343 U.S. 395, 72 S.Ct. 824, 96 L.Ed. 1027 (1952), wherein the Supreme Court declared that a management rights clause is an appropriate subject for bargaining.[11] The Board, while conceding that Chevron's position on the management rights clause is not in itself evidence of a refusal to bargain in good faith, points out that the management rights provision, when coupled with no-strike, no-arbitration clauses, severely restricts the area in which the Union may effectively represent and protect the employees. The Board reasons that the Company's insistence on a combination of clauses that would, in the Board's view, "undermine the Union's status, authority and prestige as an employee representative" constitutes evidence of the Company's bad faith.

■ Although § 8(d) of the Act imposes upon the parties the obligation to meet and confer in good faith with respect to wages, hours and other terms and conditions of employment with a view to the final negotiation and execution of an agreement, the statute specifically provides that this obligation "does not compel either party to agree to a proposal or require the making of a concession."[12] Adamant insistence on a bargaining position, then, is not in itself a refusal to bargain in good faith. Indeed, we stated in National Labor Relations Board v. Herman Sausage Company, *supra*, "If the insistence is genuinely and sincerely held, if it is not mere window dressing, it may be maintained forever though it produce a stalemate. Deep conviction, firmly held and from which no withdrawal will be made, may be more than the traditional opening gambit of a labor controversy. It may

---

10. Johannessen testified that the Company had successfully negotiated contracts containing similar provisions with three other affiliates of the AFL–CIO.

11. The Supreme Court, faced with a broad management rights clause and the company's refusal to permit matters relating to hiring, discharging, hours, and working conditions to be submitted to grievance procedures or arbitration, stated, "Whether a contract should contain a clause fixing standards for such matters as work scheduling or should provide for more flexible treatment of such matters is an issue for determina-

tion across the bargaining table, not by the Board. If the latter approach is agreed upon, the extent of union and management participation in the administration of such matters is itself a condition of employment to be settled by bargaining.

"Accordingly, we reject the Board's holding that bargaining for the management functions clause proposed by respondent was, *per se*, an unfair labor practice." 343 U.S. at 409, 72 S.Ct. at 832, 96 L.Ed. at 1039.

12. 29 U.S.C.A. § 158(d).

be both the right of the citizen and essential to our economic legal system * * of free collective bargaining. The Government, through the Board, may not subject the parties to direction either by compulsory arbitration or the more subtle means of determining that the position is inherently unreasonable, or unfair, or impracticable, or unsound." 275 F.2d at 231.

An argument similar to the one made here by the Board was presented to and rejected by this Court in National Labor Relations Board v. Cummer-Graham Company, 5th Cir. 1960, 279 F.2d 757. In that matter the company insisted upon the inclusion of a no-strike clause in the contract. The union's acceptance of the clause was contingent upon the inclusion of an arbitration provision, a concession the company refused to make. The Board found that the company had refused to bargain with the union in good faith. We said,

> * * * It may be that most no-strike clauses are accompanied by arbitration provisions. It may be too, that if we were entitled to an opinion, which we are not, we would believe that arbitration would normally be a desirable adjunct of a commitment not to strike. These are matters for management and labor to resolve, if they can, at the bargaining table. If they cannot there be decided, then neither Board nor Court can compel an agreement or require a concession. N.L.R.B. v. American National Insurance Co., 343 U.S. 395, 72 S.Ct. 824, 96 L.Ed. 1027; White v. N.L.R.B., 5 Cir., 1958, 255 F. 2d 564; N.L.R.B. v. Taormina, 5 Cir., 1957, 244 F.2d 197. We do not think that the Supreme Court held, or intended to hold, in Lincoln Mills, that a no-strike clause and an arbitration clause were so much one that a persistent demand for the one without acquiescing in the other is a refusal to bargain in good faith.

> Contracts containing covenants against strikes are not unknown in the field of labor-management relations. N.L.R.B. v. Norfolk Shipbuilding & Drydock

Corporation, 4 Cir., 1952, 195 F.2d 632; Scullin Steel Company, 65 N.L. R.B. 1294. The same contention was made in White v. N.L.R.B., 5 Cir., 1958, 255 F.2d 564, as the Board urges here. In the White case a finding could have been made that the employer insisted upon a contract by which the employees would surrender their right to strike, and giving to management the right to hire, fire and fix wages without a binding arbitration clause. This insistence, it was held, was not a failure to bargain in good faith. The Sixth Circuit, in a like case, reached a like result. N.L.R.B. v. United Clay Mines Corporation, 6 Cir., 1955, 219 F.2d 120. * * * *If the respondent had, and we say it did have, the legal right to insist upon the terms of its proposal, we think it cannot be said that the exercise of the right is evidence of bad faith.* * * *
(Emphasis added) 279 F.2d at 759–760.

In view of the principles stated above, we are unable to agree with the Board's contention that the Company's position with regard to the management rights, no-strike, no-arbitration clauses warrants a finding of bad faith. Nor can we agree with the Board's argument that the Company's rejection of the Union's proffered concessions and proposals evidences a refusal to bargain in good faith. The Act does not require an employer to abandon a position because of either the quantity or quality of concessions offered by the Union in the hope of securing that abandonment. N.L.R.B. v. United Clay Mines Corp., 6th Cir. 1955, 219 F.2d 120.

In our opinion the matter at hand resolves itself into purely a question of hard bargaining between two parties who were possessed of disparate economic power: A relatively weak Union encountered a relatively strong Company. The Company naturally desired to use its advantage to retain as many rights as possible. We do not believe, however, that that desire is inconsistent with good faith bargaining. *See* H. K. Porter Co., Inc. v. N.L.R.B., 397 U.S.

99, 90 S.Ct. 821, 25 L.Ed.2d 146 (1970); N.L.R.B. v. Alva Allen Industries, Inc., *supra.* Collective bargaining by its very nature is "an annealing process hammered out under the most severe and competing forces and counteracting pressures." N.L.R.B. v. Dalton Brick & Tile Corp., 5th Cir. 1962, 301 F.2d 886, 895. The Board is charged with the responsibility of overseeing and refereeing the bargaining process, but is not empowered to compel, either directly or indirectly, concessions or otherwise sit in judgment upon the substantive terms of the agreement. H. K. Porter Co., Inc. v. N.L.R.B., *supra*; N.L.R.B. v. Insurance Agents' Intern. Union, 361 U.S. 477, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960); N.L.R.B. v. American National Insurance Co., *supra*; M. R. & R. Trucking Co. v. N.L.R.B., 5th Cir. 1970, 434 F.2d 689; N.L.R.B. v. Herman Sausage Co., *supra.* It follows that "it is not for the Board to balance the scales or equalize or neutralize pressures in the name of lack of good faith." M. R. & R. Trucking Co. v. N.L.R.B., *supra* at 695.

■ It is appropriate to reiterate here a portion of what was stated in White v. N.L.R.B., *supra,* 255 F.2d at 569, and N.L.R.B. v. Cummer-Graham Company, *supra,* 279 F.2d at 761: "We do not hold that under no possible circumstances can the mere content of various proposals and counter proposals of management and union be sufficient evidence of a want of good faith to justify a holding to that effect." We do here hold that there is not substantial evidence on the record as a whole to support the Board's finding that the Company went through the motions of negotiation as an elaborate pretense with no sincere desire to reach an agreement. Accordingly, we deny enforcement as to this portion of the Board's order.

### III.

*§ 8(a) (1) and (3) Charges: Chevron's Withholding of Wages*

■ During the course of the negotiations the Company granted non-Union employees certain wage increases and improved benefits that it denied Union-represented employees. In response to the General Counsel's assertion that the Company's conduct in withholding the benefits was violative of the Act, the Trial Examiner found that the Company was simply exerting economic pressure at the bargaining table to force Local 826 to sign as favorable a contract as possible from the Company's standpoint. The Trial Examiner determined that the conduct had neither the purpose nor the effect of coercing employees in the exercise of their bargaining rights or of discouraging their desire for membership in the Union. Accordingly, he dismissed the Union's § 8(a) (1) and (3) charges. The Board, however, determined that the Company's withholding of benefits had interfered with its employees' rights and that the employees should be made whole for the losses they had sustained. But the Board stated, "Were it not for the unfair labor practices setting in which the withholding action occurred, we would have had no hesitancy in adopting the Trial Examiner's finding. It has long been an established Board principle that, in a context of good-faith bargaining, and absent other proof of unlawful motive, an employer is privileged to withhold from organized employees wage increases granted to unorganized employees or to condition their grant upon final contract settlement." We have determined that the Board's finding that the Company's withholding action occurred within a bad-faith bargaining context is not supported by substantial evidence on the record as a whole. It follows that the Company was within permissible bounds in refraining from granting the benefits to the Union-represented employees in the absence of an agreement. *See* H. K. Porter Co., Inc. v. N.L.R.B., *supra*; American Ship Building Co. v. N.L.R.B., 380 U.S. 300, 85 S. Ct. 955, 13 L.Ed.2d 855 (1965); N.L.R.B. v. Insurance Agents' Intern. Union, 361 U.S. 477, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960). As to this portion of the Board's order, then, enforcement is denied.

Enforcement is granted in part, denied in part.