**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**CROCKETT–BRADLEY, INC., Concrete Sciences, Inc., C. B. Materials, Inc., and R. E. Holton, Inc., Respondents.**

No. 74–3773.

United States Court of Appeals, Fifth Circuit.

July 13, 1979.

Elliott Moore, Deputy Associate Gen. Counsel, John H. Ferguson, Atty., N. L. R. B., Washington, D. C., Paul Elkind, Asst. Gen. Counsel, for Contempt Litigation, Ruth E. Peters, N. L. R. B., Washington, D. C., for petitioner.

H. Victor Hansen, Charles Kelso, Michael C. Towers, Atlanta, Ga., for respondents.

Before WISDOM, CLARK and FAY, Circuit Judges.

FAY, Circuit Judge:

This case involves a civil contempt proceeding brought by the National Labor Relations Board against Crockett-Bradley (the company) alleging that the company had failed to meet its bargaining obligations under the National Labor Relations Act and had thereby violated this Court's judgment ordering it to bargain. The Special Master recommends that Crockett-Bradley be held in contempt. After a complete review of the record we conclude that there is insufficient evidence to hold the company in contempt. Therefore, we deny the petition.

## I. FACTS

Appellants are four corporations operating as a single integrated enterprise engaged in the application of gunnite as part of the construction of residential and commercial swimming pools.[1] Concrete Sciences, Inc. is the parent company and Crockett-Bradley, Inc., C. B. Materials, Inc. and R. E. Holton, Inc. are its wholly owned subsidiaries based in the Fort Lauderdale-Miami area. The four corporations employ a total of 110 workers. Crockett-Bradley is primarily engaged in installing gunnite for residential swimming pool construction. C. B. Materials is engaged in supplying employees and materials to Crockett-Bradley. R. E. Holton, which has only two employees (both union members), performs gunnite work primarily in commercial construction whenever the contract calls for union labor. Appellants file a consolidated balance sheet and profit and loss statement for tax purposes.

In 1974 Crockett-Bradley, Inc. had 26 drivers in the bargaining unit and at that time was operating transit mix trucks (concrete mixer trucks). The drivers initially received wages of $4.50 an hour which were raised to $5.00 an hour after 90 days. Towards the end of 1974 the company decided to convert from transit mix trucks to mobile batch plants by installing a batch plant consisting of separate cement and sand compartments on each truck. A transit mixer normally delivered 12 batches a day, whereas the mobile batch plant delivers 15 batches a day. The cost of the conversion was $345,000 for 23 trucks. As a result of the changeover the work force was reduced from 26 drivers to 14 drivers. This was accomplished late in 1974 and the hourly wage was increased to $5.10 an hour. At the time of the hearing the company owned 23 mobile batch plants but only 15 were in operation due to the fact that the volume of work had declined from roughly 400–500 batches per day in 1973 to 100–200 batches in 1975, 1976 and 1977.

The company had given 10–20 cents per hour increases to some of the "hole men" who were not members of the bargaining unit. However, no cost-of-living increases or across-the-board raises of any kind had been given since early 1975. A cost-of-living increase was given to the two union employees of R. J. Holton, Inc.

1. Gunnite is a dry mixture of sand and cement to which water is added when the mixture is forced through a high pressure hose.

Net sales for the year 1975 totalled $3,306,694. This figure increased to $3,967,147 for the 1976 period. The consolidated return showed a loss of $15,002 for 1975 and $11,033 for 1976. The company attempted to offset the slump in business beginning in 1975 by opening up branch offices in Jacksonville, Tampa, and Fort Myers. Prices were increased from $40 to $48 a ton between 1974 and the present. Nicholas Sattee, Treasurer-Secretary of Crockett-Bradley, testified that he received a salary of $38,000 in 1974, $46,000 in 1975 and $46,000 in 1976 (of which he returned $12,000 to the company). Some employees who were on hourly wages were put on salaries.

On November 14, 1975, this Court issued an opinion, *National Labor Relations Board v. Crockett-Bradley, Inc. et al.,* 523 F.2d 449 (5th Cir. 1975), holding that the company had engaged in unfair labor practices and concluding that "such extensive and egregious unfair labor practices justify a Board bargaining order on the theory that the employer interference realistically had precluded the possibility of a fair election taking place." *Id.* at 451. On December 8, 1975 this Court entered its judgment enforcing the Board's decision and order dated July 15, 1974 (amended August 5, 1974) which directed the company to bargain with Teamsters Local 769.

Upon the union requesting appellants to commence collective bargaining negotiations, the parties met on eight occasions between January 30, 1976 and June 3, 1976 without reaching an agreement.

When negotiations began on January 30, 1976, as a result of the union's request of December, 1975, Anthony J. Cannestro, President of Teamster's Local 769 represented the 10 mobile batch truck drivers in the bargaining unit. Attorney H. Victor Hansen and Treasurer-Secretary Nicholas Sattee represented the company. Sattee testified that his company was the only one in the industry to be organized and that such organization "could ruin" the company. The construction industry was going through a particularly bad period and Sattee expressed his concern about the very survival of the organization. He instructed the attorney to get the best contract that he could and to preserve management prerogatives as much as possible to ensure control over the day to day operation of the company. Hansen was authorized by the company to handle the negotiations even on minor matters. During the first meeting in January, 1976 which was attended by Hansen, Cannestro and Sattee, the possibility of a wage increase was inquired into. Cannestro recalled that the figure of 25 cents per hour was mentioned. The conversation was said to have occurred at the time when Cannestro handed Hansen a three page list of demands including a demand for a $1.90 an hour wage increase for the first year and a $1.00 increase for each of the two subsequent years as well as other provisions of the Maule Industries contract which had previously been negotiated by Hansen's firm. However, even Cannestro agreed that the contract provisions in the Maule contract were only guides since the benefits given were very liberal, negotiated during boom times and pertained to an industry which, unlike Crockett-Bradley's, was totally unionized. Cannestro testified that although his request for the wage increase could be characterized as "Playhouse 90", he knew he was dealing with an experienced negotiator and that there was an understanding that this was merely an opening proposal. Sattee stated that he did not remember any conversation involving a 25 cent raise but that he could not categorically state that it hadn't occurred. Hansen stated that he did not mention a particular figure but that he indicated there might be some increase.

In addition to the wage proposal, the three page union document contained 31 other provisions which included: a recognition article; a check off article; a grievance and arbitration procedure; 40 hour guaranteed work week; overtime; half hour paid lunch break; 15 minutes paid morning break; seniority article; contributions to pension plan; group insurance plan; nine holidays; cost of living allowance; a schedule of paid vacations; workmen's compensation articles; military service article;

bereavement article involving four days paid leave; union access article; separate union bulletin board; two weeks severance pay; a leave of absence provision; a shop steward article; sick leave; safety article; dispatching on seniority basis; safety equipment; paid uniforms; physical examinations to be paid by the company; company paid medical expenses for illnesses or infirmities created by the gunnite operation; maintenance of benefits article; three year period for the contract; negotiations during regular business hours at straight time rate for three members of the negotiating committee and union reservation of the right to change, amend, add or delete proposals during negotiations.

Between the second and fifth meetings the company offered its counter-proposals to the union's demands and there were discussions of these proposals. After the fifth meeting the union argued to the National Labor Relations Board that the company was not bargaining in good faith. The National Labor Relations Board answered on April 16, 1976 and declined to institute contempt proceedings. There were three other meetings after the National Labor Relations Board's April, 1976 letter. During the course of negotiations the company proposed, among other things, the following: [1] a management rights clause which essentially stated that all of the enumerated rights of management would remain in management and that the exercise would not be subject to grievance or arbitration except as to those rights which were specifically abridged by other provisions in the contract; [2] a seniority clause which provided that seniority and ability would determine the order of layoff, with ability to be determined exclusively by the company. The company explained that it was in its best interest to retain the most able men notwithstanding seniority and without the cost of arbitration being the deciding factor in every layoff decision; [3] a "zipper" clause which provided that once the contract was executed there would be no further negotiations of the contract during its term even if neither the company nor the union had contemplated a specific situation;

[4] a shop steward clause which provided that any business conducted by the shop steward on behalf of the union or the employees would not be conducted on company time. The company was willing to handle grievances after hours, also taking the time of a member of management; [5] a grievance and arbitration clause for resolution of disagreements over the terms of the contract but the company's position was that any grievance should be formalized in writing while the union proposal called for an oral first step; [6] a proposal limiting dues check-off to union members and which would require an employee to renew his check-off authorization every thirty days by reporting in person to a secretary or receptionist instead of yearly as permitted by the Taft-Hartley Act. At the last meeting the company agreed to split the cost of the arbitrator with the union. The major difference between the company and the union was on the subject matters for grievance and arbitration. The company proposed that grievance and arbitration be limited to the application of specific terms of the contract. The union wanted the right to grieve and arbitrate any action of management.

The company argued that the description of the bargaining unit by the administrative law judge in 1973 was no longer accurate and proposed that a current description be incorporated into the recognition clause. The company claims that it was always clear that it would accept the administrative law judge's description rather than lose the contract.

On the subject of safety, the union wanted safety to be covered under the grievance and arbitration procedures. The company did not want to handle it that way because it argued that the Occupational Safety and Health Administration (OSHA) would not be bound by the arbitrator's decision and the union could therefore retry an adverse decision by the arbitrator simply by filing a complaint with OSHA.

On the final meeting the company repeated an earlier offer to allow the union to inspect the company's financial records.

The union stated that it would arrange an inspection but no such inspection ever took place. After this last meeting the union again asked the Board to institute contempt proceedings.

On May 2, 1977, the Board filed its civil contempt petition alleging that the company had failed to meet its bargaining obligations under the National Labor Relations Act and had thereby violated the Court's judgment ordering it to bargain. On August 1, 1977 Administrative Law Judge Paul N. Pfeiffer was appointed by this Court as Special Master to conduct a hearing to determine factual and legal issues raised by the Board's petition. In his report, dated August 14, 1978, the Special Master found that the company had violated this Court's judgment in the manner alleged by the Board and recommended the company be held in contempt. The company filed exceptions to the findings and conclusions of the Master. The Board filed a brief in support of the Master's findings and recommendation.

## II. CONTEMPT PROCEEDINGS UNDER § 8(a)(5) and 8(b)(3) OF THE NATIONAL LABOR RELATIONS ACT

It is clear that the party urging contempt has the burden before the Special Master of establishing non-compliance with the Court's judgment by clear and convincing evidence. *NLRB v. Laney & Duke Storage Warehouse Co.,* 424 F.2d 109, 112 (5th Cir. 1970). Sections 8(a)(5) and 8(b)(3) of the National Labor Relations Act (the Act), 29 U.S.C. § 158(a)(5) and (b)(3) require that the company and the union bargain in good faith. It is recognized that bad faith is perhaps hard to detect in certain cases because it can be cloaked in a mantle of finesse and sophistication. "Consequently, to sit at a bargaining table, or to sit almost forever, or to make concessions here and there, could be the very means by which to conceal purposeful strategy to make bargaining futile or fail." *NLRB v. Herman Sausage,* 275 F.2d 229, at 232 (5th Cir. 1960). However, it is also clear that although an employer is obligated to bargain

in good faith, he is not required to yield positions which he fairly maintains. It is not proper for the government, through the Board, to coerce concessions through the threat of contempt. The Board is not permitted to sit in judgment upon the substantive terms of the bargaining to determine what positions are reasonable or fair. *See Gulf State Mfrgs., Inc. v. NLRB,* 579 F.2d 1298, 1318–1325 (5th Cir. 1978).

In the case before us, the Special Master questioned the reasonableness of the company's position. He questioned the reasonableness of the capital investment of the company in converting its concrete trucks to mobile batch plant trucks, he found it unfair and unreasonable that no cost-of-living increases had been given since 1975, and similarly disapproved of the company's policy in not granting sick leave or severance pay. Furthermore, the Master stated that the company could have saved money by hiring local Florida counsel instead of having its counsel fly in from Atlanta, Georgia for meetings and hearings.

Generally we are reluctant to upset the findings of the Special Master. Under Fed.R.Civ.P. 53(e)(2) this Court must accept the Master's findings unless they are clearly erroneous. This is the same standard governing review of district courts' findings of fact. *See O., C. & Atomic Wkrs. Int. Union, AFL–CIO v. NLRB,* 178 U.S. App.D.C. 278, 547 F.2d 575 (1976); *NLRB v. Alamo Express,* 420 F.2d 1216, 1217 (5th Cir. 1969).

> The party excepting to the master's findings carries the burden of proving them to be clearly erroneous . . . and the court must uphold a finding, even if it is thought to go against the weight of the evidence, unless the error is clear . . . At the same time, the mere fact that a finding is supported by substantial evidence does not prevent its being overturned if the reviewing court, with due regard for the master's opportunity to judge credibility, "is left with the definite and firm conviction that a mistake has been committed."

178 U.S.App.D.C. at 283, 547 F.2d at 580 (citations omitted). However, it was improper for the Master in this case to base his determination of bad faith on whether the position of the company was inherently unreasonable, unfair, impracticable or unsound. *See, e. g.,* 275 F.2d at 231.

The Board argues that

"[t]he Company's unswerving approach to management rights, along with its broad no-strike and zipper clauses, was in effect an attempt to preclude the Union from having any voice at all on matters which could be of extreme importance to employees in the bargaining unit . . . ."

It is true that the company proposed a management rights clause which essentially stated that all enumerated rights of management would remain in management and that their exercise would not be subject to grievance or arbitration except those rights which would be specifically abridged by other provisions in the contract. It is also true that the company proposed a no-strike clause which banned all strikes and a zipper clause which provided that the company need not bargain during the term of the contract about items covered in the contract or not referred to in the contract, even though the matter may not have been within the contemplation of the parties at the time they negotiated the contract. Following *Chevron Oil Co., Standard Oil Co. of Tex. Div. v. NLRB,* 442 F.2d 1067 (5th Cir. 1971) we find that the company's position with regard to the management rights, no-strike clause and zipper clause do not warrant a determination of bad faith. It must be noted that this union contract was the first in the South Florida gunnite industry, and that at the time negotiations were begun the construction industry was experiencing grave financial difficulties. Despite the severe recession in South Florida and the admitted problems facing the industry at the time, the union initially proposed that the company grant a $1.90 wage increase during the first year of a three year

contract and $1.00 increases for each of the following two years. Although the union admits this wage proposal was high it termed the proposal a "negotiating tactic." Yet when the company attempted a "negotiating tactic" regarding the check-off procedure (the company suggested that the employees reaffirm their desire to pay union dues every month) the union termed it "bad faith."

Similarly, there was no evidence of bad faith by appellant's suggestion that the Recognition Clause be changed from the definition given in 1973 by an administrative law judge to one which would more closely fit in with the company's present employee units. There is no evidence that appellant was using this suggested change in unit description as a pre-condition to signing a contract.

■ Even though upon further negotiations it may appear from the facts that the company is merely "surface bargaining", such a conclusion is not proper at this time, especially since the parties were only at the "proposal stage." The record shows that the company attended every negotiating session called by the union (there is evidence that the union's employee committee failed to attend one of these meetings which had to be cancelled) and that various propositions such as bulletin boards, bereavement pay and holidays falling on Saturday or Sunday celebrated Monday, were progressing.[2] Admittedly, much remains to be resolved. It may well be that the company and the union will not come to a collective bargaining agreement. But inability to reach an agreement is not in itself evidence of bad faith.

Again, as in the somewhat analogous problem of § 8(a)(3), discriminatory discharges, the employer may have either good or bad reasons, or no reason at all, for insistence on the inclusion or exclusion of a proposed contract term. If the insistence is genuinely and sincerely held,

---

**2.** Indeed, the union itself was not very cooperative. When the company rejected the union's proposal of two weeks severance pay after *six months* employment but indicated it would consider severance pay if the employee had been working a longer period, the union countered with a proposal of *seven months.*

if it is not a mere window dressing, it may be maintained forever though it produce a stalemate.

275 F.2d at 231.

We have only succinctly covered the extensive findings of fact reached by the Special Master. We are aware of the burdensome task of sifting through such voluminous testimony. However, after careful consideration of the entire record, we find that although both parties may have engaged in some "Playhouse 90"—as they termed it—there is insufficient evidence in the record to warrant finding the company in contempt.[3]

PETITION DENIED.

---

3. Because we do not find that this motion for contempt by the union was frivolous or without foundation, we cannot consider fees and costs under *Christiansburg v. EEOC,* 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978).