**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**A–1 KING SIZE SANDWICHES, INC., Respondent.**

No. 83–3193.

United States Court of Appeals, Eleventh Circuit.

May 21, 1984.

Elliott Moore, Deputy Assoc. Gen. Counsel, N.L.R.B., Elinor H. Stillman, Washington, D.C., for petitioner.

John W. Caven, Jr., Jacksonville, Fla., for respondent.

Before RONEY and HENDERSON, Circuit Judges, and DYER, Senior Circuit Judge.

DYER, Senior Circuit Judge:

This case is before us upon the application of the National Labor Relations Board pursuant to Section 10(e) of the National Labor Relations Act, 29 U.S.C. §§ 151, 160(e) (1982), for enforcement of its order issued against A–1 King Size Sandwiches, Inc.

The Hotel, Motel, Restaurant Employees & Bartenders Union, Local No. 737, filed an unfair labor practice charge against the Company, alleging that the Company failed to bargain in good faith, and, instead, engaged in surface bargaining. In due course the administrative law judge issued a decision finding that the Company had violated Section 8(a)(1) and (5) of the Act, 29 U.S.C. §§ 158(a)(1), (5) (1982), by engaging in surface bargaining with no intention of entering into a collective bargaining agreement. The Board affirmed the administrative law judge's rulings, findings and conclusions.

The Company argues that its proposals were not so unusually harsh, vindictive or unreasonable that they were predictably unacceptable, and its bargaining was therefore in good faith. We disagree and enforce.

The Company produces sandwiches and pies on an assembly line. It sells, distributes and delivers these products to convenience stores. After a Board certification of the Union, as the exclusive bargaining representative for a unit of the Company's production and maintenance employees, shuttle truck drivers, and shipping helpers, including between fifty and sixty employees, A–1 unsuccessfully challenged certification by refusing to bargain. The Board's bargaining order was enforced by the United States Court of Appeals, Fifth Circuit.

There were eighteen bargaining sessions at agreed times and places during an eleven-month period. The negotiations did not result in a contract. The parties reached agreement on a recognition clause; plant visitation by Union representatives; the number, rights and duties of Union stewards; the Union's use of a bulletin board; pay for jury duty; leaves of absence; and a procedure for processing grievances and conducting arbitrations with respect to matters of interpretation or application of express provisions of the contract. As to all other subjects no agreement was reached. The administrative law judge properly found that the Company met at reasonable times and places, and that the Company bore no animus toward the Union. There is no evidence that the Company engaged in any conduct away from the bargaining table that might tend to show it would not conclude an agreement with the Union.

The well-settled principles bearing upon the issues here presented are easily stated

but not so easily applied. Section 8(a)(5) of the Act, 29 U.S.C. § 158(a)(5) (1982), makes it an unfair labor practice for an employer to refuse to bargain collectively with the employees' representative. The Supreme Court, in establishing the parameters to be applied under the Act, has said, "the Act does not compel any agreement whatsoever between employees and employers." *NLRB v. American Nat'l Ins.*, 343 U.S. 395, 402, 72 S.Ct. 824, 828, 96 L.Ed. 1027 (1952) (citing *Labor Board v. Jones & Laughlin Steel*, 301 U.S. 1, 45, 57 S.Ct. 615, 628, 81 L.Ed. 893 (1937)). "And it is equally clear that [under section 8(d) of the Act] the Board may not, either directly or indirectly, compel concessions or otherwise sit in judgment upon the substantive terms of collective bargaining agreements." *American Nat'l Ins.*, 343 U.S. at 404, 72 S.Ct. at 829. However, "[e]nforcement of the obligation to bargain collectively is crucial to the statutory scheme. And, as has long been recognized, performance of the duty to bargain requires more than a willingness to enter upon a sterile discussion of union-management differences." 343 U.S. at 402, 72 S.Ct. at 828. Moreover,

> In evaluating the parties' good faith, the Board is not precluded from examining the substantive proposals put forth. Indeed ... if the Board is not to be blinded by empty talk and by mere surface motions of collective bargaining, it must take some cognizance of the reasonableness of the positions taken by the employer in the course of bargaining negotiations.

*NLRB v. F. Strauss & Son, Inc.*, 536 F.2d 60, 64 (5th Cir.1976) (quoting *NLRB v. Reed & Prince Mfg. Co.*, 205 F.2d 131, 134 (1st Cir.1953), *cert. denied*, 346 U.S. 887, 74 S.Ct. 139, 98 L.Ed. 391 (1953); *see also Huck Mfg. v. NLRB*, 693 F.2d 1176, 1188 (5th Cir.1982). And "[s]ometimes, especially if the parties are sophisticated, the only indicia of bad faith may be the proposals advanced and adhered to," *NLRB v. Wright Motors, Inc.*, 603 F.2d 604, 609 (7th Cir.1979).

In *Chevron Oil Company, Standard Oil Company of Texas Division v. NLRB*, 442 F.2d 1067, 1074 (5th Cir.1971), the Court was careful to iterate what it had said on previous occasions, "We do not hold that under no possible circumstances can the mere content of various proposals and counter proposals of management and union be sufficient evidence of a want of good faith to justify a holding to that effect." *Id.* at 1074 (quoting *NLRB v. Cummer-Graham Co.*, 279 F.2d 757, 761 (5th Cir. 1960) and *White v. NLRB*, 255 F.2d 564, 569 (5th Cir.1958)).

The question to be decided is a narrow one: Whether the content of the Company's bargaining proposals together with the positions taken by the Company are sufficient to establish that it entered into bargaining with no real intention of concluding a collective bargaining agreement. We defer to the Board to make the initial determination, but we are required to review the proposals to determine whether the Board's findings are supported by substantial evidence on the record as a whole. *See Huck Mfg.*, 693 F.2d at 1187; *F. Strauss & Son, Inc., Supra*, 536 F.2d at 65.

## WAGES

The Company's proposal on wages retained its historic method of paying each employee. Wage increases were to be determined solely on the basis of semi-annual merit wage reviews in which the Union would be given notice of each separate review and could participate in the process, but the Company would make the final decision as to any increases. Under the wage proposal the Company was barred from reducing the wages of any employee whose wages had once risen above that level. The Union proposed a specific wage schedule but the Company adhered to its original wage proposal.

The Company insisted that it remain in total control over wages. Its proposal to continue granting wage increases on the basis of semi-annual wage reviews, in which the Company would make the final decision, coupled with the Company's Man-

agement Rights clause, *infra,* under which it had the exclusive right to evaluate, reward, promote and demote employees, left the Union's "participation" in the process meaningless. The Union was foreclosed from introducing factors other than merit into the equation. It had no contractual remedies since the granting or withholding of merit increases would not be arbitrable. The Union could not strike and, in fact, it had no leverage to require its views to be taken into account. Moreover, once an employee's wage rate increased above the level of the rate existing at the time of the contract, the Company could unilaterally reduce that which had been given in a previous merit increase and the Union could not grieve such action. It could not strike, and under the Zipper Clause, *infra,* it could not even discuss the matter with the Company. Thus, the Company's unalterable position was that it remain in total control of this mandatory subject of bargaining.

## MANAGEMENT RIGHTS

The Company submitted a management rights clause which initially provided that the Company retained exclusively all of its normal inherent rights and exempted the Company's decisions concerning these rights from the grievance procedure. Later the Company proposed a new management rights clause, which was much broader than the first proposal, and which reserved exclusively to the Company all authority customarily exercised by Management and "each and every right, power and privilege that it had ever enjoyed, whether exercised or not, except insofar as [the Company] has, by express and specific terms of the agreement, agreed to limitations." It further provided that the Company was authorized to:

1. Determine the qualifications and select its employees.

2. Determine the size and composition of its work forces.

3. Determine work schedules and all methods of production.

4. Assign overtime work.

5. Determine the number and types of equipment.

6. Hire, retire, promote, demote, evaluate, transfer, suspend, assign, direct, lay off and recall employees.

7. Reward, reprimand, discharge or otherwise discipline employees.

8. Determine job content and minimum training qualifications for job classifications and the amounts and types of work to be performed by employees.

9. Establish and change working rules and regulations.

10. Establish new jobs and abolish or change existing jobs.

11. Increase or decrease the number of jobs or employees.

12. Determine whether and to what extent the work required in its operations should be performed by employees.

13. Have supervisors or other non-union employees perform work of the kind performed by employees of the Union.

14. Determine assignments of work.

15. Discontinue, transfer or assign all or any part of its functions, services or production or other operations.

16. Subcontract any part of the Company's work.

17. Expand, reduce, alter, combine, transfer, assign, cease or create any job, job classification, department or operation for business purposes.

18. Alter or vary practices.

19. Otherwise generally manage the business, direct the work force and establish terms and conditions of employment.

The new proposal further expanded the original by providing that the Company could exercise all of its reserved rights without advising the Union of any such proposed action, change or modification, and exempted the Company from any requirement to negotiate over the decision, or its effects on employees except as altered by the Agreement. The substituted proposal no longer contained a clause expressly excluding the Company's decisions from the grievance and arbitration procedure.

This proposal gave the Company the absolute right to subcontract work, assign it to supervisors, abolish jobs, and transfer, discontinue or assign any or all of its operations. It also required the Union to relinquish the employees' statutory right to notice and bargaining over such actions and their effects. Finally, the grievance and arbitration procedure was largely illusory because actions taken under this clause were subject to that procedure only if the right was limited by express contractual provision, and there was no such limitation.

## ZIPPER CLAUSE

The Company proposed a "zipper" clause under which "the parties [waived the] right to bargain during the life of the agreement regarding any subject or any matter referred to or covered in the agreement or any other subject matter which could be considered mandatory or permissive subject of bargaining under existing law." The Union offered to agree to the clause if the latter portion waiving the right to bargain over any other mandatory or permissive bargaining subject was deleted. The Company refused.

## NO STRIKE CLAUSE

The Company proposed a no strike clause that prohibited both the Union and employees from calling, encouraging, ratifying, participating in or engaging in any primary or sympathy strike, slow down, boycott, picketing or any other work interruption for any reason, including but not limited to alleged or actual unfair labor practices, alleged or actual unfair employment practices under any anti-discrimination law, alleged or actual breaches of contract, and showing support or sympathy for other employees or Union or their activities. The Union, although conceding that any contract would contain a no-strike clause, objected to waiving employees' right to strike over unfair labor practices or unfair employment practices. The Company declined to change the proposal. This extremely broad "no strike" clause clearly prohibited any strike for any reason.

## DISCHARGE AND DISCIPLINE

The Union proposed that the Company have the right to discipline an employee for any just or sufficient cause. The Company, citing meritless discrimination charges filed against it, refused the proposal because it would subject all of the discipline and discharge actions to grievance-arbitration. This is a common non-controversial clause. When considered with the rights expressly reserved in the management rights Clause, to suspend, reprimand, discharge, or otherwise discipline employees, the Company retained unfettered control over discharges and discipline.

## LAYOFF AND RECALL

With respect to layoff and recall, the Company proposed that the layoff of employees would be at the Company's sole discretion. Company-wide seniority would be considered but not controlling. Selection for layoff would not be the subject of grievance or arbitration. Recall from layoff was to be at the discretion of the Company and it was not required to consider seniority. The Company insisted on the clause as presented because it wanted to make the decisions on the basis of productivity and not seniority and not make the ability question subject to grievance and arbitration.

This clause gave the Company absolute control over the selection of employees for layoff and recall and freed it from its statutory obligation to bargain over these subjects.

## DUES CHECK–OFF

The Union proposed a dues check-off clause which the Company rejected as being nothing more than a Union security device and because it made employees' earnings appear lower.

## NON-DISCRIMINATION CLAUSE

The Union proposed a non-discrimination clause. The Company rejected this proposal saying that it merely restated existing

law. Further, the Company considered the Union trigger-happy about filing complaints and did not want such complaints to be arbitrable.

The Union finally proposed a "swap off." The Union would agree to some type of management rights, no strike and zipper clauses if the Company would agree to a just cause for discipline and discharge provision, and seniority for layoff and recall provision. The Company refused.

Deciding when a party has reached the "point when hard bargaining ends and obstructionist intransigence begins," *NLRB v. Big Three Industries*, 497 F.2d 43, 47 (5th Cir.1974), is "an inescapably elusive inquiry." *Id.* at 46. But it is clear from our extended recital of the proposals made over a ten-month period that the Company insisted on unilateral control over virtually all significant terms and conditions of employment, including discharge, discipline, layoff, recall, subcontracting and assignment of unit work to supervisors.

Its efforts were focused on requiring the employees to surrender statutory rights to bargain, or strike, without offering any real incentive for a surrender of such rights.

The Company refused to give the Union any voice whatsoever concerning employee work and safety rules, time studies, production quotas, overtime assignments, transfers, retirement, demotions and employee qualifications—all mandatory subjects of bargaining. Elimination of unit work, discipline or discharge of employees, layoff and recall were all exempted from the grievance and arbitration procedure.

The Company's rejection of the Union's dues check-off provision was not based on any legitimate business reason and does not satisfy the statutory obligation to bargain in good faith. *See NLRB v. J.P. Stevens & Co., Gulistan Div.*, 538 F.2d 1152, 1165 (5th Cir.1976). Furthermore, we are unimpressed with the Company's rejection of a non-discriminatory clause because the Union "was trigger-happy" about filing complaints. The clause did no more than require the Company to abide by federal law to avoid discrimination against its employees on account of race, sex, age, national origin or union affiliation.

Finally, it is worthy of note that the Company responded to the Union's objections to the breadth of its original management rights and zipper clauses by submitting new proposals that were even broader. Such bargaining is clearly an indicia that the Company had little desire to work towards agreement of a contract.

The Board correctly inferred bad faith from the Company's insistence on proposals that are so unusually harsh and unreasonable that they are predictably unworkable. *See NLRB v. Wright Motors*, 603 F.2d at 610. They would have left the Union and the employees with substantially fewer rights and less protection than they would have had if they had relied solely upon the Union's certification. *See NLRB v. Johnson Mfg. Co. of Lubbock*, 458 F.2d 453 (5th Cir.1972). The Board in *Johnson* found that:

> the Company insisted on retaining unilateral control of matters which are traditionally bargainable subjects; that is, wages, hours, suspensions, disciplinary actions, discharges, and other conditions of employment, while at the same time insisting that the Union forfeit its primary defense to employer abuse of control. Moreover, the Respondents' insistence that the Union give up its right to bargain about, or to arbitrate, labor disputes in return for an agreement which merely incorporated existing company practices, and merely providing the Union with the right to strike in protest of alleged violations of the contract during its term, was an unfair demand of the Union... The Company was unwilling to offer any provisions which would give its employees or the Union anything more than they would have with no contract at all. As pointed out, the Company insisted as a price for any contract, that its employees give up their statutory rights to be properly represented by a union and contemporaneously insisted that the Union's hands be tied in the

effective processing and settling of employee grievances...."

*NLRB v. Johnson,* 458 F.2d at 455.

The *Johnson* court enforced the Board's order "because these findings clearly demonstrated surface bargaining used as a cloak to conceal the employer's bad faith." *Id.* at 455 (citations omitted). Here we are faced with proposals that go further than those in *Johnson,* i.e., the management rights and zipper clauses are broader, and the Company's demand for a no-strike clause without any concessions was not present in *Johnson.*

We are unpersuaded that *NLRB v. Tomco Communications,* 567 F.2d 871 (9th Cir. 1978) and *Pease v. NLRB,* 666 F.2d 1044 (6th Cir.1981), relied on by the Company, are in conflict with our holding in this case. In both cases, the court recognized that the Board could properly infer bad faith from proposals alone, and in *Pease* the court expressly found that the proposals before them were not as aggravated as those in *Johnson.*

Similarly, the Company's reliance on *Gulf States Manufacturers v. NLRB,* 579 F.2d 1298 (5th Cir.1978), is misplaced. In that case the employees retained their rights to strike if arbitration was rejected on any particular issue; the employer proposed four wage schedules and a dues check-off clause; and, finally, the employer produced completed collective bargaining agreements containing provisions comparable to those it proposed.

Finally, *NLRB v. Crockett-Bradley,* 598 F.2d 971 (5th Cir.1979) and *Chevron Oil Co., Standard Oil Co. of Texas Division v. NLRB,* 442 F.2d 1067 (5th Cir.1971) relied on by the Company are readily distinguishable. In *Crockett-Bradley* the employees were not barred from striking or grieving employer actions concerning significant terms and conditions of employment, and in *Chevron* the employer did not demand unilateral control over every significant term and condition of employment.

ENFORCED.