### NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

### WRIGHT MOTORS, INC., Respondent.

### No. 78–2340.

United States Court of Appeals, Seventh Circuit.

Argued June 4, 1979.

Decided July 16, 1979.[*]

---

* This appeal was originally decided by unreported order on July 16, 1979. See Circuit Rule 35. The Court has subsequently decided to issue the decision as an opinion.

Edward S. Dorsey, N.L.R.B., Washington, D. C., for petitioner.

Arthur D. Rutkowski, Evansville, Ind., for respondent.

Before CASTLE, Senior Circuit Judge, CUMMINGS and BAUER, Circuit Judges.

CUMMINGS, Circuit Judge.

On May 9, 1977, the Union [1] charged that the employer, Wright Motors, Inc., had violated Sections 8(a)(5) and (1) of the National Labor Relations Act (29 U.S.C. § 158(a)(5) and (1)) by refusing to bargain in good faith, and the Regional Director filed a complaint based on that charge. After a hearing, the Administrative Law Judge (ALJ) agreed with the Union and ordered the employer to bargain collectively and in good faith.[2] The employer filed exceptions but a three-member panel of the National Labor Relations Board sustained the ALJ's conclusions and adopted his recommended order. The Board now seeks enforcement of its order, pursuant to Section 10(e) of the Act (29 U.S.C. § 160(e)).

---

1. Local 215 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

2. The ALJ's order required the employer to cease and desist from refusing to bargain and from interfering with the exercise of its employees' Section 7 rights. It affirmatively ordered the employer to bargain upon request, to post a notice pledging to bargain in good faith, and to notify the Regional Director of steps taken to comply with the order.

We have decided that the order should be enforced in part.

After a representation election, the Union was certified by the Board on October 19, 1973. The employer refused to bargain on the basis of asserted election irregularities. The Board found this refusal to bargain to be a violation of Section 8(a)(5) and (1) of the Act and this Court in an unpublished order affirmed the Union's certification and enforced the Board's bargaining order. Enforcement reported at 529 F.2d 529. The company sought a writ of certiorari from the Supreme Court, but this was denied on October 4, 1976, 429 U.S. 826, 97 S.Ct. 81, 50 L.Ed.2d 88. In the interim, the Union had repeatedly requested bargaining but the employer refused to bargain until the litigation was terminated.

On November 15, 1976, after the Supreme Court had denied a writ of certiorari, the Union again requested bargaining. The employer directed the Union to its attorney who was to be its bargaining agent. The Union contacted the attorney, Arthur Rutkowski, on January 3, 1977,[3] and the first bargaining session was held on February 14. The ALJ in his opinion and the parties in their briefs have set out in great detail the course of negotiations between that first February meeting and the October 25 hearing on the unfair labor practice charge. We have carefully considered all of those versions of events, as well as the exhibits submitted to the ALJ, and conclude that insofar as the Board's order is based on the employer's delaying meeting with the Union or its delaying providing the Union with relevant information, it should not be enforced. However, the ALJ's conclusion, adopted by the Board, that the employer engaged in "surface bargaining with no sincere intention of reaching agreement" (App. 15) has substantial support in the record and will be enforced.

The ALJ concluded that the employer "embarked upon a plan or strategy to ensure the failure of the collective bargaining process by (1) delaying meeting with the Union; (2) delaying providing the Union with relevant bargaining information; and

(3) engaging in surface bargaining * * " (App. 15). We agree with the employer that the first two conclusions cannot be sustained. Neither ground was specified in the charge or complaint. In addition, the finding of delay in meeting is without substantial support in the record and the charge of delay in providing information was specifically disclaimed by counsel for the Board's General Counsel.

The charge and subsequent complaint alleged only that the employer refused to bargain in good faith after being requested to do so on November 15, 1976, or after the February 14, 1977, meeting. It was not based on delay in meeting or in furnishing information.

### Delay in Meeting

The ALJ's opinion shows that in reaching his conclusion that the employer delayed meeting with the Union he impermissibly relied upon the employer's refusal to bargain during the three years the certification of the Union was being litigated. Thus he stated:

"On this record one fact stands out. In June, 1973, a majority of Respondent's employees in the appropriate unit asked to be represented by the Union. As of the date of this Decision, almost 5 years later, there has been no bargaining on the primary, statutory subjects of collective bargaining, wages and hours.

* * * * * *

"On January 3 the Union wrote to Rutkowski. It would take another month, until February 14, before Rutkowski was willing to meet. Ordinarily, a delay of a month or so in scheduling an initial meeting would not in and of itself be evidence of bad faith. But these employees had been denied their bargaining rights for the preceding 3 years while Respondent litigated its obligation to bargain. In such circumstances good faith on the part of the Respondent required that it respond with alacrity to the Union's first request * * *." (App. 13.)

We think the employer's argument that this reasoning improperly penalized its decision

3. All subsequent dates are in 1977.

to litigate the Union's certification is well taken. *Smith Steel Workers v. A. O. Smith Corporation*, 420 F.2d 1, 9 (7th Cir. 1969); *Continental Nut Company*, 195 NLRB 841, 858 (1972). Indeed, the Board in its decision adopting the ALJ's order specifically disclaimed reliance "on the fact that Respondent chose to litigate the question of its obligation to bargain" (App. 19, n.1). Yet unless that litigation-related delay is taken into account, there is insufficient evidence in the record to support the conclusion that there was any delay. As the ALJ acknowledged, the lapse of one month between the bargaining request and the initial meeting would not suffice to support the order.[4] We therefore conclude that the portion of the order relating to delay in meeting should not be enforced and that the clause referring to that delay in the notice the employer is required to post should be deleted.

*Delay in Furnishing Relevant Bargaining Information*

■ As seen, the ALJ also concluded that the employer had delayed in furnishing relevant bargaining information. Presumably, this conclusion is based on the following finding of fact:

"Little, if anything, was accomplished at the meeting of February 14. The Union presented its basic contract and asked for current wage and fringe benefits information, to which it was clearly entitled. Respondent vacillated, first providing the information in general rather than specific dollar amounts, then asserting that the Union could get the wage information itself, that the Company did not have the dollar amounts of fringe benefits, and finally that Rutkowski was

not sure the Union was entitled to this information. Almost 2 months later on April 8, after further, urgent correspondence, Rutkowski forwarded the requested information to the Union." (App. 13.)

As previously noted, neither the charge nor the complaint alleged that the employer had delayed in submitting relevant information. Significantly, at the end of the hearing, counsel for the employer specifically asked counsel for the General Counsel whether she was asserting delay in submitting information when requested, and she stated "No. He furnished it" (App. 62). Counsel for the employer put on no evidence regarding any delay in furnishing requested information. On appeal, he represented to this Court that

"the Company could have witnesses testify to General Counsel's admission that bargaining information was furnished upon request, with specific evidence of what information the Union requested, and the receipt of such information" (Tr. 16).

Moreover, it appears that information with regard to wages was not easily available, since many of the employees were paid on a commission basis. Because the employer was deprived of an opportunity to present a defense, the portion of the ALJ's order based on delay in presenting information will not be enforced, and the related language should be deleted from the required notice.

*Bad Faith Bargaining*

■ The Board argues on appeal that the ALJ's conclusions regarding delay in meeting and in furnishing information were not independent violations but were merely specific findings supporting the conclusion that

---

4. The only other colorable claims of delay involve the employer's response to the November 15 bargaining request and the gap between the June 24 and October 18 meetings. But the employer's November 19 answer that the Union should contact the attorney who would be doing the bargaining was not evasive. And the Union then delayed approximately six weeks before contacting him. The hiatus in bargaining over the summer was caused by the Union's cancelling of a meeting due to a personal emergency, the unavailability of various negoti-

ators (for both the employer and the Union at different times) because of their work and vacation schedules, and the Union's belief that the employer would refuse to bargain after the complaint in this case was filed, as it had previously when involved in litigation. It is undisputed that the Union did not request bargaining after June 24 until the end of September, and that it did not respond to a late June letter from Mr. Rutkowski suggesting that the Union negotiators contact him to schedule another session.

the employer had failed to bargain in good faith. In view of the reasons discussed above that impel us to reject those findings, we do not think they are supportable even for the purpose of bolstering the conclusion of bad faith bargaining.

The sole remaining question is whether the employer's conduct at the bargaining table demonstrated that it was not negotiating in good faith. Recognizing that this presents a difficult question of ascertaining the intention of the employer, we conclude that there was substantial evidence in the record on which the ALJ based his conclusion that the employer had engaged in surface bargaining. We therefore will enforce the Board's order to that extent.

The ALJ recognized the delicacy of the task of determining whether the employer " 'went through the motions of negotiation as an elaborate pretense with no sincere desire to reach agreement or that he bargained in good faith but was unable to arrive at an acceptable agreement with the Union.' Quoting *NLRB v. Reed & Prince Manufacturing Company*, 205 F.2d 131, 139–140 (C.A. 1, 1953)." (App. 12.)

He clearly recognized that the Board may not substitute its judgment for that of the parties.

Nevertheless, he concluded on the basis of a painstaking review of the evidence that the employer was not engaging in hard bargaining or maintaining a legitimately held position, but instead was insisting on unreasonable positions to avoid negotiating on economic issues and "to ensure no bargain through the tactics of delay" [5] (App. 15). These conclusions are supported by the record. Especially in view of the fact that two of the negotiators were before the ALJ, we will not disturb his findings.

The employer argues that the charge was premature, since it was filed after only three bargaining sessions had been held. However, if, as the ALJ concluded, the negotiations were not progressing because of the employer's insistence on unreasonable provisions, the Union should not be compelled to continue the charade for more sessions before asserting its statutorily protected right. The employer also points to its relinquishment in October of its extreme positions on the management rights and

5. The ALJ's specific findings were as follows:
Respondent [company] presented 36 written, counter proposals. Some of these proposals would have put the employees in a far worse position with the Union than without it. Others would have so damaged the Union's ability to function as the employees' bargaining representative that Rutkowski, a skillful and experienced practitioner, could not possibly have expected that they could result in serious and meaningful collective bargaining. The provisions are set forth above. I repeat the more flagrant ones here. An "open shop" was guaranteed, limiting the Union's right to secure members and check off authorizations to pay for the costs of union representation. A lengthy management rights clause, not subject to the grievance procedure, gave the Company exclusive control over hours, work rules, and production, and authorized the Company to subcontract, curtail or shut down its business completely without regard to the effect on employment. An extraordinary no strike-no lockout clause required the Union to fine "any employee" who engaged in a prohibited work interruption, granted the Company the right to seek an injunction and damages against the Union without arbitrating the claim, made the Union, "its officers, agents, and members" lia-

ble individually and collectively for damages, required the Union to waive its legal right to remove a suit from a State or Federal court, provided for a $20,000 bond to be forfeited as liquidated damages in the event of a violation of the article (in addition to actual damages), and limited the authority of an Arbitrator in providing a remedy. An article on arbitration provided only for limited and permissive arbitration. Hourly wage rates and promotions would be set at the Company's sole discretion.

Not until May 24, after the charge in this case was filed, did Respondent agree to mandatory arbitration, remove its limitation on the Arbitrator's authority under the No Strike-No Lockout provision, agree that management rights would be subject to the grievance procedure, and eliminate lesser, but equally unacceptable language.

Not until October 21, after the complaint in this case was issued and 4 days before the hearing, did the Respondent withdraw other of its extreme proposals of March 9 under its No Strike-No Lockout article, the article on Arbitration, the specific requirement for an open shop, and the provisions that wage rates and promotions be set at the Company's sole discretion. (App. 13–14.)

no-strike issues as evidence of its good faith, and suggests that it is illogical and counter-productive to find from the later concessions that the earlier positions were unreasonable. However, the ALJ did not hold that the later concessions were evidence of bad faith but merely concluded that they would not exonerate the earlier bad-faith bargaining.

Finally, relying on *Gulf State Manufacturers, Inc. v. NLRB*, 579 F.2d 1298 (5th Cir. 1978) and *NLRB v. Tomco Communications, Inc.*, 567 F.2d 871 (9th Cir. 1978), the employer insists that it was merely engaged in hard bargaining and that the Board is not free to require it to make concessions to the Union. But the difference between the factual situations in *Gulf* and *Tomco* and in this case actually demonstrate the distinction between hard bargaining and bad faith bargaining. In *Gulf*, the court specifically found that both the Union and the employer had engaged in hard bargaining. The Union argued, as it did in this case, that the employer's proposals were so outrageous that they could not have been made in good faith. The employer demonstrated at trial that in fact numerous collective bargaining agreements did incorporate substantially the same provisions as those suggested by the employer, thus refuting the allegation that they were so outrageous as to be evidence of bad faith. In addition, the court concluded

"An examination of the detailed description of the bargaining sessions . . . reveals that they were give and take meetings wherein both parties made concessions on many questions and agreements were reached on many disputed issues." 579 F.2d at 1326.

In contrast, in the present case the employer did not attempt to defend its extreme proposals, to which it clung for six months. See note 5, *supra*. In addition, the record

in this case, unlike the *Gulf* case, does not reveal bona fide concessions on substantial issues[6] that might indicate that the employer was not merely being intransigent.[7]

The *Tomco* case is even less helpful to the company. In *Tomco*, the ALJ reviewed the record carefully and found that the employer had bargained in good faith until the parties reached an impasse on wages and the employer began a lockout. The ALJ went on to find that because there were a few non-mandatory subjects of bargaining still outstanding at the time of the lockout, the lockout constituted an unfair labor practice. The Board reversed this erroneous legal conclusion but went on to find— contrary to the ALJ—that the employer had been engaging in surface bargaining throughout. The Ninth Circuit reversed this factual finding, holding that there was no substantial evidence on the basis of which to reverse the ALJ's findings. It concluded that in the case before it the parties had bargained to an impasse over wages, but cautioned that

"[a] proposal, not the cause of impasse, may nevertheless contain terms so hostile to the role of the other side's bargaining representatives that it constitutes evidence of bad faith." 567 F.2d at 881–882.

We share the concern of the ALJ and the courts in the *Gulf* and *Tomco* cases that neither the Board nor the courts should sit in judgment on the substantive terms offered by parties negotiating in good faith. It is equally clear, however, that the Union has an enforceable right to good faith bargaining. *NLRB v. Hibbard*, 273 F.2d 565 (7th Cir. 1960); *Kayser-Roth Hosiery Co. v. NLRB*, 430 F.2d 701, 702–703 (6th Cir. 1970). Sometimes, especially if the parties are sophisticated, the only indicia of bad faith may be the proposals advanced and adhered to. *NLRB v. Holmes Tuttle Broadway Ford, Inc.*, 465 F.2d 717, 719 (9th

---

6. The issues that were agreed upon prior to the October sessions involved the posting of bulletin board notices, reporting pay, leaves of absence, plant visitation and the like.

7. We are not suggesting that the company must make any concessions to the Union. In fact, when an apparently justified charge has been made that the company proposed and adhered to unreasonable positions as a means of avoiding its bargaining obligation, a course of bargaining showing that the company made some reasonable concessions may refute the accusation of bad faith. Here there was no evidence of good faith bargaining to refute the Union's showing of an unreasonable bargaining posture.

Cir. 1972); *Vanderbilt Products, Inc. v. NLRB*, 297 F.2d 833 (2d Cir. 1961); *NLRB v. Reed & Prince Manufacturing Co.*, 205 F.2d 131, 134–135, 139 (1st Cir. 1953), certiorari denied, 346 U.S. 887, 74 S.Ct. 139, 98 L.Ed. 391. The fact that it may be difficult to distinguish bad faith bargaining from hard bargaining cannot excuse our obligation to do so.

We find that the combination of unrealistically harsh positions adhered to by the company for six months [8] and the avoidance of bargaining on key economic issues [9] provides substantial support for the ALJ's conclusion. Therefore, that portion of the Board's order finding that the company violated Section 8(a)(5) and (1) by engaging in surface bargaining will be enforced.

Enforced In Part.

---

8. The fact that the employer carefully stated that it was not "wedded to" any particular proposal will not exonerate it when its intransigent bargaining posture belies its words. See note 5 *supra*.

9. The employer suggested to this Court that wages and hours were not key issues in this case since most of the employees were paid on a commission basis. But the Union may still have been interested in the wage rate, for instance in changing the commission rate or establishing a guaranteed minimum. The fact that these issues were never negotiated does not indicate that they were unimportant, but, as the ALJ found, that the negotiations were stalled by the employer's focusing on the objectionable clauses discussed in the text. Finally, any contention that wages and hours were not important in this situation is belied by the Union's persistent requests for information regarding them. The exhibits before the ALJ show that information on wages and hours was the very first request made at the first bargaining session.