**LAPHAM–HICKEY STEEL CORP., d/b/a Stephenson–Yost Steel Co., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

Nos. 89–2337, 89–2621.

United States Court of Appeals, Seventh Circuit.

Argued April 17, 1990.

Decided June 19, 1990.

Steven B. Varick and William J. Cooney, McBride, Baker & Coles, Chicago, Ill., for petitioner.

Aileen A. Armstrong, Robert F. Mace, N.L.R.B., Appellate Court, Enforcement Litigation, Barbara A. Atkin, N.L.R.B., Washington, D.C., and Elizabeth Kinney, N.L.R.B., Region 13, Chicago, Ill., for respondent.

Before FLAUM and RIPPLE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

FLAUM, Circuit Judge.

Lapham–Hickey petitions for review of an order by the National Labor Relations Board (the "Board") finding that it violated the National Labor Relations Act, 29 U.S.C. § 141 *et seq.* (the "Act"), by failing to bargain in good faith without reaching a genuine impasse before implementing its final bargaining offer and by refusing to reinstate unfair labor practice strikers upon their unconditional offer to return to work. The Board cross-petitions for enforcement of the Board's order. We grant enforcement.

### I.

Petitioner Lapham–Hickey Steel Corp., doing business as Stephenson–Yost Steel Company (the "Company"), processes and sells carbon steel goods from various locations, including North Kansas City (Mo.), St. Louis, Chicago and St. Paul. Respondent United Steelworkers of America, District 34 (the "Union"), represents the employees at the Company's North Kansas City facility. The Union and the Company were parties to a collective bargaining agreement which was set to expire on September 30, 1986. In July, 1986, the Union and the Company agreed to renegotiate the collective bargaining agreement when it expired.

On September 19, 1986, the parties held what was to be the first of two bargaining sessions to discuss and negotiate a new contract. The parties began by exchanging written proposals. The two proposals differed in many respects. Most significantly, the Union's proposal sought substantially increased wages, the changing of one job classification, liberalized leave and health care benefits and an increase in the cost-of-living adjustment. The Company's proposal was in the form of a complete contract package and provided, *inter alia*, for reductions in pay rates for leadmen, new hires, and the number of job classifications, and the elimination of cost-of-living adjustments and severance pay.

The parties held their second bargaining session on September 29, 1986, and agreed to a number of substantial compromise positions. The Company presented the Union with a revised proposal which embodied several concessions to the Union's earlier demands but contained no changes concerning wages and wage-related issues. Dur-

ing the lunch break, the Union responded with a revised proposal containing provisions concerning severance pay and the cost-of-living adjustment as well as calling for a 44–cent–per–hour wage increase to match those enjoyed by the Company's employees at its St. Louis facility. The union negotiator initially told the Company's bargaining representatives that wage parity was necessary to "make it fly," but later backed off and stated that the Union was willing to give up other items to obtain the wage increase. In response, the Company refused to discuss any possible movement on other issues and, after the lunch break, presented what it termed its "final offer," which included a three year freeze on wages and vacation benefits, the reduction of wages for new hires by $3.00 per hour, and the elimination of cost-of-living adjustments and severance pay. The Company stated that the offer was final and that the Union could "take it or leave it" as the Company was unwilling to explore movement on other economic items in return for any proposed wage increase. The Union representatives responded that its members would, without question, reject the offer, and reemphasized that it was willing to discuss tradeoffs to secure the wage increase. The Company's sole response was that it was their final offer. The proposal was unanimously rejected by the Union's membership later that day.

On September 30, 1986, the Company posted a bulletin at the North Kansas City facility implementing its final offer by announcing the economic terms contained in the Company's final offer to the Union as the employees' new conditions of employment. The bulletin stated that these conditions would become effective the following day because "there is no signed contract as of Midnight September 30, 1986." Immediately thereafter the Union tried to contact the Company's bargaining representatives, repeatedly leaving messages for them in an effort to schedule further negotiations. The messages were not returned.

Despite the breakdown in negotiations, the Union's members continued to work. On October 1, 1986, the Union's bargaining representatives wrote to the Company stat-

ing that the unit employees would continue working and that the Union remained willing to negotiate further on their behalf. On October 9, 1986, the Company responded by letter, stating that it had made its final offer and that there was nothing further to discuss. The Union's negotiating representatives then contacted a federal mediator who attempted unsuccessfully to arrange for the Company to meet with the Union.

On May 12 and 13, 1987, the Company entered into collective bargaining negotiations with a union representing employees at its Chicago facility. The Union's negotiating representatives attended these negotiations, as did union representatives from a union at the Company's St. Paul facility. At the May 13 meeting, a representative of the Chicago union made a proposal to the Company that would create wage parity between the three units. The proposal was rejected by the Company.

After contract negotiations in Chicago stalled, the Union's representatives returned to Kansas City and conducted a meeting of employees to discuss the Union's options concerning bargaining with the Company at that point in time. The representatives told the employees that they could continue to try to meet with the Company in order to resolve the contract differences or they could strike in order to force the Company to the bargaining table. The employees met the next day and voted unanimously to strike. Within the next few days, employees at both the St. Louis and Chicago facilities voted to go on strike as well. On May 20 and 21, the Company notified the employees individually that if they remained on strike their status would be that of economic strikers, subject to replacement. The employees were further informed that, until replaced, they were welcome to return to their jobs.

The parties met once again on July 9, 1987. At that meeting, the Union applied for reinstatement on behalf of its employees. The Union's bargaining representative also stated that he considered the replacement employees to be unfair "scabs" serving only as temporary replacements.

The Company responded that it considered them to be permanent employees and that the Union would have to wait for a ruling by the Board before the Company would consider reinstating the strikers.

The Board, affirming the decision of an administrative law judge (the "ALJ"), found that the Company violated § 8(a)(5) and (1) of the Act by failing to bargain in good faith and by making unilateral changes in the unit employees' terms and conditions of employment without reaching a bona fide impasse with the Union. The Board further found that the employees' strike was an unfair labor practice strike; that the employees made an unconditional offer to return to work on July 9, 1987; and that the Company violated § 8(a)(3) and (1) of the Act by failing to reinstate the employees immediately following their unconditional offer to return to work. Based on these findings, the Board ordered the Company to cease and desist from the unlawful conduct found, and from interfering with, restraining or coercing the exercise of their rights under § 7 of the Act. Affirmatively, the Board ordered the Company to bargain, on request, with the Union as the exclusive representative of the unit employees; to embody any understanding reached in a signed agreement; to offer immediate reinstatement to the unit employees who made an unconditional offer to return to work on July 9, 1987; to make those employees whole for any lost wages; to expunge from its files any reference to the unlawful refusal to reinstate those employees; and to post an appropriate notice. The Company petitions for review of the Board's findings that it violated the Act. The Board cross-petitions for enforcement of its order. For the reasons stated below, we grant enforcement.

## II.

The Company challenges the Board's order on the grounds that the Board's findings are erroneous and are not supported by substantial evidence. More specifically, the Company asserts that it was the Union rather than the Company that failed to bargain in good faith to impasse; that the strike by Union members was an economic strike rather than an unfair labor practice strike; and that the employees failed to make an unconditional offer to return to work on July 9, 1987. We address each of these assertions in turn.

■ Our standard of review is set forth in 29 U.S.C. § 160(e), which provides, in relevant part, that "the findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." 29 U.S.C. § 160(e). *See also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951); *Kankakee–Iroquois County Employers' Ass'n v. NLRB*, 825 F.2d 1091 (7th Cir.1987). The Board's conclusions may not be displaced on review simply because the reviewing court might justifiably have reached different conclusions had it considered the matters *de novo. NLRB v. United Insurance Co.*, 390 U.S. 254, 260, 88 S.Ct. 988, 991, 19 L.Ed.2d 1083 (1968). Moreover, we must "recognize the Board's special function of applying the provisions of the Act to the complexities of industrial life." *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 236, 83 S.Ct. 1139, 1150, 10 L.Ed.2d 308 (1963).

The Company first challenges the Board's finding that it violated § 8(a)(1) and (5) of the Act by failing to bargain in good faith to impasse before implementing its final offer. It argues that the Union caused a genuine impasse in negotiations when it took the hard-line position that wage parity with the St. Louis facility was necessary to "make it fly" and that there could be no further bargaining on any issue until this demand was met. This stance by the Union, the Company contends, created an unbreakable deadlock, thus justifying the Company in implementing its own final proposal after it was rejected by the employees. The Company also contends that the Board's findings were tainted by an erroneous factual finding by the ALJ that it was the Company rather than the Union that demanded wage parity with the St. Louis facility.

■ An employer violates § 8(a)(1) and (5) of the Act when it unilaterally changes a condition of employment that is under negotiation before bargaining has reached an impasse. *NLRB v. Katz,* 369 U.S. 736, 743, 82 S.Ct. 1107, 1111, 8 L.Ed.2d 230 (1962); *Richmond Recording Corp. v. NLRB,* 836 F.2d 289, 293 (7th Cir.1987). After an impasse has been reached, however, the employer can implement the changes unilaterally as long as the changes were previously offered to the union. *Richmond Recording,* 836 F.2d at 293. A bona fide impasse occurs when the parties are deadlocked after "a reasonable effort at good-faith bargaining which, despite noble intentions, does not conclude in an agreement between the parties." *NLRB v. Big Three Industries, Inc.,* 497 F.2d 43, 48 (5th Cir.1974). The Board "may determine that an impasse exists 'where good faith bargaining has not resolved a key issue and where there are no definite plans for further efforts to break the deadlock.'" *Richmond Recording,* 836 F.2d at 293 (citation omitted). We have held that "an adherence to unrealistically harsh positions throughout the bargaining process and an avoidance of any discussion of key economic issues constitutes a failure to bargain in good faith." *Kankakee–Iroquois,* 825 F.2d at 1094. *See also NLRB v. Wright Motors, Inc.,* 603 F.2d 604, 610 (7th Cir.1979). The determination of when an impasse exists is a question of fact, and "[b]ecause of the subjectivity involved in deciding when an impasse has occurred, its existence is an inquiry 'particularly amenable to the expertise of the Board as a fact-finder.'" *Richmond Recording,* 836 F.2d at 293 (citations omitted). We determine whether there has been good faith bargaining by examining the conduct of the parties as a whole. *International Union, Auto Workers v. NLRB,* 732 F.2d 573, 578 (7th Cir.1984).

■ It is apparent after reviewing the record as a whole that substantial evidence supports the Board's finding that the Company failed to bargain in good faith and that *a genuine impasse was never reached* before the Company unilaterally implemented its final offer. The record reveals that the parties held two five and one-half hour bargaining sessions before the Company unilaterally declared an impasse and refused to bargain further. During the morning of the second session, the parties agreed to a number of compromises on economic issues, including leadmen pay and the retention of the existing dental and medical insurance plans. In reaching these compromises, both parties demonstrated a willingness to move on major issues. When the Union attempted to negotiate wages by presenting a new proposal for wage parity with the Company's St. Louis facility, it expressly stated that it was willing to give up other economic benefits in exchange for a wage increase. At that time, several important economic issues remained unresolved. Rather than consider the Union's proposal and its pronouncement that it *would be willing to move on* other economic issues, the Company responded by refusing to discuss the proposal, and, instead, produced its self-declared "final offer" and immediately declared an unbreakable impasse. Despite the parties' earlier success at reaching compromises on major issues and the Union's declaration that it was willing to compromise further, the Company chose to treat the Union's proposal as unalterable and seized upon it as an excuse to present its final offer to the Union. When the Union again offered to discuss tradeoffs, stating that its membership would reject the offer, the Company refused and reiterated that it was not interested. Although the Company had every reason to believe that its offer would be rejected by the employees, it gave the Union a "take-it-or-leave-it" ultimatum and refused to discuss modifications or tradeoffs. For the next nine months, the Company refused the Union's repeated requests to bargain.

In support of its claim that the parties had reached a deadlock and that the Union was unwilling to bargain in good faith, the Company relies on the statement of the Union negotiator that wage parity was essential to "make it fly." The Company's reliance on this single statement for support of its asserted perception that no agreement could be reached is insufficient.

When confronted with the Company's final offer, the Union negotiator repeatedly made it clear to the Company that the Union was willing to discuss tradeoffs in exchange for increased wages at that time. With such significant economic issues such as cost-of-living adjustment, severance pay and vacation benefits yet to be agreed upon, it was unreasonable for the Company to assume that the Union was not willing to bargain further and that the parties were mired in a deadlock. We are in agreement with the Board that "the parties' ability to compromise and reach agreement on numerous, previously disputed issues that morning demonstrates that neither party could have reasonably concluded at that juncture that further bargaining was not possible."

■ More troubling is the Company's assertion that the Board's findings are tainted by the ALJ's erroneous factual finding that the Company, rather than the Union, was the party insisting on wage parity. In its brief, the Board acknowledges that the ALJ was incorrect on this fundamental fact. At oral argument counsel for both the Company and the Board were unable to provide any explanation for the ALJ's misperception of a central and apparently uncontested fact. The Company argues that we should afford little deference to the ALJ's analysis which relies on a clear error of fact.

We are somewhat perplexed that the ALJ in this case could err on such a fundamental factual issue that was not disputed by either party. Such an error raises concerns as to the validity of his other factual findings. In this case the parties do not challenge the ALJ's other factual findings, as adopted by the Board, as much they do the legal characterization given those findings. Were we reviewing the ALJ's decision itself, we would be hard-pressed to afford it appropriate deference in light of the aforementioned error. Here, however, it is the *Board's* decision, rather than that of the ALJ, which is subject to our scrutiny under the substantial evidence test. Our role is to review the record to determine whether the Board's findings are supported by substantial evidence and "the record as a whole includes not only the documentary and testimonial evidence presented in the case, but also the report of the ALJ, whose findings must be accorded 'the relevance they reasonably command.'" *NLRB v. Stor–Rite Metal Products*, 856 F.2d 957, 964 (7th Cir.1988) (quoting *Universal Camera*, 340 U.S. at 497, 71 S.Ct. at 469). Where the Board does not accept the ALJ's findings, the reviewing court "does not abandon 'the substantial evidence' standard of review" but the "evidence supporting the Board's conclusion may be viewed as 'less substantial' than it would be if the Board and the ALJ had reached the same conclusion." *Stor–Rite*, 856 F.2d at 964. Where, as here, the ALJ was in error on an essential fact, we must be especially critical of the Board's treatment, given that it is based in large part on the decision of the ALJ.

After carefully reviewing the record as a whole, we find that the ALJ's factual error is in no way fatal to the Board's order. In its extensive opinion, the Board expressly noted and clarified the ALJ's mistake and stated that it found ample other evidence to support its findings. Indeed, regardless of the ALJ's error, the evidence is overwhelmingly in support of the Board's findings. The Board's findings were untainted by the ALJ's mistake. In sum, we hold that the Board's conclusion that the "the true bargaining objective" of the Company was to "declar[e] an impasse for the purpose of implementing its own terms and conditions of employment rather than reaching agreement with the Union" is supported by substantial evidence.

The Company next alleges that the Board's finding that the employees' strike was an unfair labor practice strike rather than an economic strike is not supported by substantial evidence. More precisely, the Company contends that the employees' decision to strike, which occurred seven and one-half months after the Company implemented its final offer, was motivated by the failure of economic negotiations between the Company and union representatives of its Chicago facility. In this respect, the Company alleges that the em-

ployees went on strike as a showing of solidarity with the Chicago union which was attempting to achieve favorable goals for all three locals. Therefore, the Company concludes, the strike was *solely* motivated by economic issues rather than any unfair labor practices engaged in by the Company some seven and one half months earlier and, accordingly, the Company was justified in hiring permanent replacements.

■ "A strike which is caused in whole or in part by an employer's unfair labor practices is an unfair labor practice strike." *Northern Wire Corp. v. NLRB,* 887 F.2d 1313, 1319 (7th Cir.1989). Thus, a strike remains an unfair labor practice strike even though the strikers may be motivated in part by economic or other objectives, if the employer's unfair labor practices are a contributing cause of the strike. *Northern Wire Corp.,* 887 F.2d at 9–11. Unfair labor practice strikers, unlike economic strikers, may not be permanently replaced and are entitled to immediate reinstatement upon their unconditional offer to return to work. *Mastro Plastics Corp. v. NLRB,* 350 U.S. 270, 278, 76 S.Ct. 349, 355, 100 L.Ed.2d 309 (1958). An employer's refusal to reinstate unfair labor practice strikers upon their unconditional offer to return to work violates § 8(a)(3) and (1) of the Act.

■ "If substantial evidence on the record as a whole supports the inference that the unfair labor practices committed by [the employer] were contributing causes of the strike, we must uphold the Board's finding and order." *NLRB v. Colonial Haven Nursing Home, Inc.,* 542 F.2d 691 (7th Cir.1976). The Board's finding that the unfair labor practices were a contributing factor to the employees' motivation to strike finds ample support in the record. The record contains the mutually corroborative and unrebutted testimony of employees and Union representatives that they decided to strike in an effort to get the Company back to the bargaining table. After negotiations in Chicago faltered, Union representatives met with the employees and told them that they could continue working at the Company's terms while the Union continued trying to persuade the Company to negotiate, or they could strike to force the Company to return to the bargaining table and bargain in good faith. The employees voted to strike because they were "fed up" with the Company's refusal to bargain. The Company's argument that the seven and one half month interim between the end of negotiations and the decision to strike means that the unfair labor practices could not possibly have been even a contributing factor in the decision to strike is wholly unsupported by the record. The Company offers its timing argument as a bald assertion, relying only on a belief that the lapse in time between the unfair labor practices and the strike necessarily means that the unfair labor practices could not have been a contributing factor to the employees' decision to strike. We are unwilling to accept such a position. Although "timing is significant, it is not conclusive in establishing the basis for a strike." *Burns Motor Freight,* 250 NLRB 276, 277–78. Where the evidence shows that the employer's unfair labor practices contributed to the strike and continued to be viewed "rather seriously" by employees despite the lapse of time, the Board may reasonably find the strike to be an unfair labor practice strike. *Northern Wire Corp.,* 887 F.2d at 13. While union solidarity may have been a motivating concern behind the Union's decision to strike, it is clear from the record that a desire to force the Company to return to the bargaining table was the single most significant motivating force. Accordingly, we find that the Board's finding that the strike was an unfair labor practice strike is supported by substantial evidence.

■ The Company's final claim is that the Board erred in finding that the Company violated § 8(a)(3) and (1) by refusing to reinstate the strikers immediately upon their unconditional offer to return to their jobs on July 9, 1987. It argues that the Union's offer to return to work was, in fact, conditioned on the Company removing the "scab" employees from the worksite. Since the offer was not unconditional, the Company argues, it did not commit an un-

fair labor practice in refusing to reinstate them.

It is well accepted that unfair labor practice strikers are entitled to reinstatement upon making an unconditional offer to return to work. *Richmond Recording*, 836 F.2d at 292. Where the offer is not unconditional, the Company is under no obligation to give them their jobs back. Our review of the record shows that the Union did indeed make an unconditional offer to return to work on behalf of its members. At the July 9 meeting, the Union offered to take down the picket lines and return striking employees to work on the following day. The Company responded by refusing to reinstate the striking employees, stating instead that they would have to wait the Board's ruling as to whether they were unfair labor practice strikers. The Union then confirmed by letter its offer to return the striking employees to work unconditionally and the Company's refusal; the Company made no response. As to the scabs, the record shows that the Union did not make their removal a condition of returning to work but instead the Union representative merely told the Company's negotiators that he believed that the replacement employees were scabs. The Company's assertion that the Union's offer was conditioned on the scabs being removed is simply not supported by the record.

### III.

The Board's findings that the Company violated the Act by failing to bargain in good faith to impasse and by refusing to reinstate unfair labor practice strikers upon their unconditional offer to return to work are supported by substantial evidence. Accordingly, we grant enforcement of the Board's order.