NATIONAL LABOR RELATIONS
BOARD, Petitioner,

and

Local 705, International Brotherhood of
Teamsters, Chauffeurs, Warehousemen
and Helpers of America, AFL–CIO, In-
tervening Petitioner,

v.

OVERNITE TRANSPORTATION
COMPANY, Respondent.

No. 90–2941.

United States Court of Appeals,
Seventh Circuit.

Argued May 8, 1991.

Decided Aug. 7, 1991.

Charles P. Donnelly, Jr., N.L.R.B., Contempt Litigation Branch, Washington, D.C., Elizabeth Kinney, N.L.R.B., Region 13, Chicago, Ill., Aileen A. Armstrong, William A. Baudler (argued), N.L.R.B., Appellate Court, Enforcement Litigation, Washington, D.C., and John F. Ward and Sheldon M. Charone (argued), Carmell, Charone, Widmer, Mathews & Moss, Chicago, Ill., for petitioners.

John O. Pollard (argued), Blakeney, Alexander & Machen, Charlotte, N.C., for respondent.

Before WOOD, Jr., COFFEY and KANNE, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

It would be an understatement to say that Overnite Transportation Company was not thrilled with the prospect of unionization. The more difficult question, and the one presented by this petition for enforcement, is whether Overnite went beyond permissible bounds in expressing that lack of enthusiasm. Specifically, did statements during the course of a Union[1] organizational drive "interfere with, restrain or coerce employees" in the exercise of their right to self-organization? *See* National Labor Relations Act ("Act"), § 8(a)(1), 29 U.S.C. § 158(a)(1). And did Overnite, upon certification of the Union, engage in "surface bargaining"? *See id.* § 8(a)(5), 29 U.S.C. § 158(a)(5). The National Labor Relations Board answered both questions in

---

1. Truck Drivers, Oil Drivers, Filling Station and Platform Workers Union, Local 705, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL–CIO [hereinafter "Union"].

the affirmative, and we uphold that decision as supported by substantial evidence.

## I.

### A. *The Company and the Organizational Drive*

Overnite is a common carrier of general commodity freight, with terminals located throughout the United States.[2] In the spring of 1982, the Union filed an election petition seeking to represent the local drivers at Overnite's terminal in Bedford Park, Illinois. The Board scheduled an election for June 17, 1982, and the Union began an organizational campaign.

Overnite was opposed to unionization and attempted to convey that message through a variety of media. Chief among those, at least for our purposes, were two meetings in which company officials expressed their concerns to the drivers. The first of these meetings occurred in April 1982, the other on the day before the election, June 16, 1982.

Vice-president Bobby Edwards gave speeches at both of these gatherings. In addressing the audience, Edwards generally used a prepared speech but at times deviated from the text that he had before him. Drivers present at the April meeting testified that Edwards said that he would never sign a contract with the Union and that he would do everything in his "extreme power" to keep the Union out of the Bedford Park terminal. Drivers also told of Edwards's references to specific transportation companies that had closed after becoming unionized and his warning that Overnite would shut down its terminal if the employees voted for the Union.

At the June meeting, the text of Edwards's speech contained the following observations:

If the Union were to get in here, it would necessarily force us—I repeat, *force us*—to switch completely in our attitude about our employees. We could no longer afford to say, "How much in

the way of improvements in wages and benefits can we afford to give our people?" The new attitude necessarily forced upon us would be, "How little can we get by with giving to these employees who are represented by this Union?"
. . .

. . . .

In all of this, there is a fundamental question which you should carry in your mind—"What is it that you may expect if this Union were to get in here?" The answer—and you should not ignore it or overlook it—the answer is *TROUBLE*! That is what this Union has brought elsewhere—strikes, lost work, lost pay, lost jobs, debt and regret—bitterness and misery. Do you see any good reason to risk all of that here?

Edwards also warned:

I think that I am justified in repeating again what we have often said to you before. If this union were voted in at Overnite what could it force us to do anyway? The answer is this—and I emphasize it with all the power at my command—*the Union could not force this Company to do anything that it does not consider to be reasonable or practical or in the best interests of you, its employees, in the long run.* Of course, the Union can try to bring pressure on the Company by pulling you out on strike. I do not want to sound abrupt in this matter, but I think that it is of the utmost importance that you understand this while there is yet time—Overnite Transportation Company has no intention of yielding to any sort of strike pressure by this Union, either now or at any time hereafter. . . .

. . . .

. . . I think you should know, however, that if the Union were to get in here and call people out on strike, the Company definitely would hire replacements for the strikers in order to keep this terminal in operation. With unemployment as high as it is, I have no doubt that plenty

**2.** For a more exhaustive exposition of the facts, *see Overnite Transp. Co.,* 296 N.L.R.B. No. 77 (1989).

of people would be glad to come in here and work despite a Teamsters strike.[3] None of Edwards's statements, either in April or June, were mitigated by assurances that strikes were not inevitable or that Overnite would bargain in good faith if the employees selected the Union as their bargaining agent.

### B. *The Bargaining Process*

Overnite's efforts notwithstanding, a majority of the local drivers voted for Union representation. The first meeting between the Union and Overnite occurred on July 27, 1982, and involved a cursory review of the Union's proposal by Overnite's representatives, one of whom was Edwards. At the next meeting, Overnite raised formal objections to the vast majority of the Union's proposals on the ground that they would create disparities between policy at the Bedford Park terminal and Overnite's other, nonunionized terminals. Those Union proposals that Overnite did accept were in large part identical to the company's existing policies; the only exceptions to this generalization were an alcohol rehabilitation plan and limited arbitration rights.[4]

Overnite used a third meeting to showcase a counterproposal, but Union negotiators took exception because it contained few, if any, deviations from Overnite's preunionization policies. The meeting ended with the Union talking openly of a strike and Overnite responding, "You are going to have to do what you are going to have to do, and we will have to do what we are going to do."

The Union subsequently arranged for a fourth meeting and presented a revised proposal that omitted a number of its earlier demands. Overnite was not "persuaded," however. It rejected the revised proposal, once again citing its desire for uniformity.

A fifth meeting involved further concessions by the Union, which was now willing to accept Overnite's counterproposal with only two modifications—a requirement that the company pay overtime and a requirement that the company institute the Union's health and welfare proposal. Overnite rejected even this attempt at compromise, claiming that the Union had not yet "convinced" it to agree to more. The meeting ended without any progress and without any expectation of future meetings.

A sixth, and final, meeting fared no better; it, too, was characterized by the adamant behavior that had stymied earlier negotiations. Overnite was "unwilling to move" in its refusal to accept the Union's proposals because the Union "had not answered the Company's objections." Union officials expressed dismay; they had never seen a company "that [said] no to everything." "We gave our proposal," Overnite retorted, prompting the Union to accuse the company of forcing a strike. "Do what you have to do," came the reply.

### C. *Proceedings Before the Board*

Believing that the act would be futile, the Union did not attempt to schedule a seventh meeting. In its place, the Union pursued the unfair labor practice charge that it had filed with the Board on October 4, 1982. A December 1982 complaint charged Overnite with violating section 8(a)(5) of the Act by refusing to bargain in good faith. The complaint did not specifically address Edwards's statements until

---

**3.** These messages were similar to those conveyed in the April meeting and in a letter that Overnite sent to its drivers on June 9, 1982. The letter warned that the company had no intention of yielding to any sort of strike pressure and that the Company could "fill the jobs of those who see fit to go out on strike." The letter also charged the Union with causing other companies to have "dilapidated and obsolete equipment, run-down terminals, thousands of employees without jobs, only occasional work for many others, and in the end financial disaster and shut-down for many of them." The employees would "be seeing much more of that in the future," the letter further warned, and by bringing in the Union they "risk[ed] tearing apart everything [they] now ha[d]."

**4.** Under Overnite's proposal, arbitration would occur only on a voluntary basis. If Overnite did not want arbitration, regardless of the significance or lack of significance of the grievance, then no arbitration proceeding would commence; the Union's only recourse would be to strike.

July 1983, when it was amended to charge independent violations of section 8(a)(1).

The ALJ, after recounting in exhaustive detail the episodes described above, concluded that the section 8(a)(1) charges were timely filed and that Edwards's statements were in violation of that portion of the Act. The ALJ also determined that Overnite had entered into collective bargaining negotiations with no intention of reaching an agreement and that this conduct was in violation of section 8(a)(5). The Board agreed with the result of the ALJ's opinion but at times used a narrower rationale.

## II.

### A. *Section 8(a)(1)*

■ Section 8(a)(1) of the Act makes it an unfair labor practice for an employer to "interfere with, restrain or coerce employees" in the exercise of their rights "to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. §§ 157, 158(a)(1).[5] Section 8(c) of the Act, in acknowledgment of the first amendment, makes it clear that "[t]he expressing of any views, argument, or opinion, or the dissemination thereof, ... shall not constitute or be evidence of an unfair labor practice." 29 U.S.C. § 158(c). This is a limited privilege, however. The Act accords no protection for views, arguments, or opinions that contain a "threat of reprisal or force or promise of benefit." *Id.; see NLRB v. Gissel Packing Co.*, 395

U.S. 575, 616–20, 89 S.Ct. 1918, 1941–43, 23 L.Ed.2d 547 (1969).

■ With this background in mind, the ALJ (and subsequently the Board) concluded that Edwards's statements were replete with thinly veiled threats of reprisal. This conclusion is supported by substantial evidence, as Edwards expressly stated that Overnite would not sign a contract with the Union and openly threatened to shut down the Bedford Park terminal in order to defeat the Union. Edwards also implied,[6] moreover, that Overnite would force a strike situation and then permanently dismiss those employees who left to join the picket lines.

■ Overnite does not dispute the coercive nature of Edwards's extemporaneous remarks, it argues simply that Edwards did not make them. Placing special emphasis on inconsistencies in the drivers' testimony, Overnite attempts to discredit the ALJ's finding that the drivers' testimony was credible. This attack, in turn, is said to undermine the ALJ's finding that Edwards improvised on the text of his prepared speeches. Credibility, however, is a function not only of what a witness says but of how a witness says it, and the cold record before this court is a poor medium for conveying anything other than a witness's exact words. This court, accordingly, will not overturn an ALJ's credibility determinations absent "'extraordinary circumstances,'"[7] none of which exist on this record.

As to the material in Edwards's prepared speeches (speeches that were admittedly delivered to the employees), Overnite accuses the Board of quoting the language

5. This intimidation need not be successful; the test "'is not whether an attempt at coercion has succeeded or failed, but whether the employer engaged in conduct which reasonably tends to interfere with, restrain, or coerce employees in the free exercise of their section 7 rights.'" *NLRB v. Illinois–American Water Co.*, 933 F.2d 1368, 1374 (7th Cir.1991) (quoting *NLRB v. Berger Transfer & Storage Co.*, 678 F.2d 679, 689 (7th Cir.1982)).

6. Coercive threats may be implied rather than stated expressly. *National By–Prods., Inc. v. NLRB*, 931 F.2d 445, 451 (7th Cir.1991). We

must be sensitive, moreover, to "the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear." *Gissel Packing*, 395 U.S. at 617.

7. *Illinois–American Water Co.*, 933 F.2d at 1374 (quoting *Berger Transfer & Storage*, 678 F.2d at 687 (ALJ's credibility determinations will stand absent clear showing of bias or ALJ's discrediting of uncontroverted testimony)).

"out of context." *See NLRB v. Harvstone Mfg. Corp.*, 785 F.2d 570, 576 (7th Cir.), *cert. denied*, 479 U.S. 821, 107 S.Ct. 88, 93 L.Ed.2d 41 (1986). Most of the alleged misquotes, however, had no relevance to the Board's decision; the ALJ relied somewhat upon the material but the Board did not. Those excerpts that the Board did find material, moreover (we have set both of them out in full), make fair use of the relevant language.

■ Overnite's final attack on the section 8(a)(1) findings is that the charge should have been dismissed because its incorporation into the amended complaint was untimely. This argument relies primarily on the six-month statute of limitations set forth in section 10(b) of the Act, 29 U.S.C. § 160(b). That period, however, applies to the filing and service of the charge, not to the issuance or amendment of the complaint. *NLRB v. Complas Indus., Inc.*, 714 F.2d 729, 732 (7th Cir.1983). A different portion of section 10(b) sets out the general rule regarding amendments: the Board may amend a complaint "at any time prior to the issuance of an order based thereon." 29 U.S.C. § 160(b); *see Complas*, 714 F.2d at 732–33 (citing *NLRB v. Dinion Coil Co.*, 201 F.2d 484, 491 (2d Cir.1952)).

■ This ability to amend the complaint is not unfettered, of course; the Board does not have carte blanche to expand the charge as it might please, or to ignore it altogether. *NLRB v. Fant Milling Co.*, 360 U.S. 301, 309, 79 S.Ct. 1179, 1184, 3 L.Ed.2d 1243 (1959). A two-part inquiry is used to determine the propriety of an amendment: (1) whether the newly alleged violation occurred within six months of the filing of the charge; and (2) whether the newly alleged violation is "closely related" to the violations alleged in the charge. *Complas*, 714 F.2d at 733 (citing *Indiana Metal Prods. Corp. v. NLRB*, 202 F.2d 613, 619 (7th Cir.1953)). Overnite does not dispute the Board's conclusion that both of Edwards's speeches took place within six months of the filing of the charge. It does dispute, however, the Board's determination that the section

8(a)(1) violation was "closely related" to the section 8(a)(5) violation alleged in the original charge.

In finding the amendment to be "closely related," the Board used a three-factor analysis articulated in *Redd–I, Inc.*, 290 N.L.R.B. No. 140 (1988):

First, we shall look at whether the otherwise untimely allegations are of the same class as the violations alleged in the pending timely charge. This means that the allegations must all involve the same legal theory and usually the same section of the Act (e.g., 8(a)(3) reprisals against union activity). Second, we shall look at whether the otherwise untimely allegations arise from the same factual situation or sequence of events as the allegations in the pending timely charge. This means that the allegations must involve similar conduct, usually during the same time period with a similar object (e.g., terminations during the same few months directed at stopping the same union organizing campaign). Finally, we look at whether a respondent would raise the same or similar defenses to both allegations, and thus whether a reasonable respondent would have preserved similar evidence and prepared a similar case in defending against the allegations in the timely pending charge.

The Board then concluded that the two alleged violations were of the same class because, although not based on the same section of the Act, they were based on the same legal theory—"Overnite's efforts to resist unionization." The Board also found that the alleged violations arose out of the same factual situation or sequence of events because the alleged 8(a)(1) violation essentially consisted of statements in which Overnite threatened to act as it actually did act in the alleged 8(a)(5) violation. Finally, the Board found that Overnite would raise similar defenses to both alleged violations.

As this court stated in *NLRB v. Braswell Motor Freight Lines*, 486 F.2d 743 (7th Cir.1973), "Section 10(b) is to be broadly construed so as to permit the [general counsel] to include in the complaint any matter of the same general nature as that

asserted in the charge." *Id.* at 746 (citing *NLRB v. Kohler Co.,* 220 F.2d 3, 6 (7th Cir.1955)). Reviewing with this directive in mind, we believe that the amendment was within the scope of the Board's authority. It is clear from the record that Overnite's threats during the organizational campaign and its subsequent behavior at the bargaining table were both part of the same "crusade directed against the Union," thus supporting the Board's findings that the two allegations involved the same legal theory [8] and arose out of the same sequence of events.[9] Edwards's statements supported both allegations, moreover, thus making it likely that a "reasonable respondent" would use overlapping defenses. Although Overnite points to a number of technical distinctions that serve to differentiate the two allegations, its argument would require precisely the sort of restrictive analysis that we cautioned against in *Braswell Motor Freight.*[10]

### B. Section 8(a)(5)

Section 8(a)(5) of the Act places upon an employer the duty "to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5). This duty requires the employer to approach collective bargaining with a good faith intention, or a "real desire," to come into agreement. *See id.* § 158(d); *NLRB v. Insurance Agents' Int'l Union,* 361 U.S. 477, 498, 80 S.Ct. 419, 432, 4 L.Ed.2d 454 (1960). If good faith exists, however, then the Board's inquiry must end; the Act "does not compel either party to agree to a proposal or require the making of a concession," 29 U.S.C. § 158(d), and it is inappropriate for the Board, either directly or indirectly, to "compel concessions or otherwise sit in judgment upon the substantive terms of collective bargaining agreements." *NLRB v. American Nat'l Ins. Co.,* 343 U.S. 395, 404, 72 S.Ct. 824, 829, 96 L.Ed. 1027 (1952).[11]

After analyzing the totality of the circumstances under which bargaining took place, *see NLRB v. Schwab Foods, Inc.,* 858 F.2d 1285, 1292 (7th Cir.1988),[12] the Board concluded that Overnite was merely going through the motions of bargaining and that the company did not have the requisite good faith. This finding of "surface bargaining" relied on Overnite's in-

**8.** Despite Overnite's suggestion to the contrary, this court and the Board have never intimated that the amendment must arise out of the same section of the Act in order to be closely related. *See, e.g., Complas,* 714 F.2d at 732–33 (amendment alleging violation of section 8(a)(1) held closely related to allegation in complaint that employer violated section 8(a)(3)).

**9.** *Northern Wire Corp. v. NLRB,* 887 F.2d 1313, 1322 (7th Cir.1989); *Braswell Motor Freight,* 486 F.2d at 746 (complaint allegations sufficiently related to charges where "company's conduct ... was part of an overall plan to resist [union] organization"); *see also Sonicraft, Inc. v. NLRB,* 905 F.2d 146 (7th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 671, 112 L.Ed.2d 664 (1991).

**10.** The ALJ also found that Overnite violated section 8(a)(1) by coercively interrogating employees in August 1982, after the Union was certified. Overnite does not challenge that finding on appeal and the Board is therefore entitled to summary enforcement on the matter. *See NLRB v. P\*I\*E Nationwide, Inc.,* 923 F.2d 506, 514 n. 9 (7th Cir.1991).

**11.** The legislative history surrounding section 8(a)(5) supports this conclusion. *See* S.Rep. No. 573, 74th Cong., 1st Sess. 12 (1935); *see also*

*American Nat'l Ins. Co.,* 343 U.S. at 403 n. 10, 72 S.Ct. at 829 n. 10.

We would also note, as we did in *Inland Tugs v. NLRB,* 918 F.2d 1299, 1308 (7th Cir.1990), that this analysis may be shortcircuited if the subject of bargaining is not "mandatory."

**12.** Overnite suggests that this court in *NLRB v. Wright Motors, Inc.,* 603 F.2d 604, 610 (7th Cir. 1979), adopted a two-part test to determine when a party was not engaging in good faith bargaining. That test would look solely at: (1) whether the party adhered to unrealistically harsh positions throughout the bargaining process; and (2) whether the party avoided bargaining on key economic issues. In Overnite's view, only conduct satisfying both of those factors would be labelled bad faith bargaining. All other bargaining would be in good faith.

A more logical reading of *Wright Motors,* however, would reveal that the opinion was merely listing the factors that supported the finding of bad faith in that particular case. There is no indication whatsoever that *Wright Motors* intended to restrict the bad faith inquiry to the elements in Overnite's "two-part test." Indeed, the opinion notes approvingly that the ALJ engaged in a "painstaking review of the evidence" before making a conclusion. *Id.* at 608.

transigence at the bargaining table as placed in context by Edwards's assertions that Overnite would never cooperate or sign a contract with the Union. These factors, when viewed together, led the Board to the conclusion that Overnite "was bent on behaving as its managers had earlier threatened and that it was not constructively approaching the collective-bargaining process with an aim of reaching an agreement with the Union."

In challenging this finding, Overnite makes much of the fact that it attended six bargaining sessions with the Union, commented on proposals, offered a counterproposal, and maintained a bargaining stance (uniformity) that had at least some merit. It points out that " '[a] party ... is entitled to stand firm on a position if he reasonably believes that it is fair and proper or that he has sufficient bargaining strength to force agreement by the other party,' "[13] and that a refusal to bargain " 'cannot be equated with "refusal to recede from an announced position" advanced and maintained in good faith.' "[14] By Overnite's account, it was merely engaging in lawful "hard bargaining" to preserve uniformity among its union and nonunion terminals.

Overnite's argument raises a valid point. If the company's behavior at the bargaining table were the only evidence of its state of mind, then it might have been difficult for the Board to support a finding that Overnite had no real desire to reach an agreement. *See Kankakee–Iroquois County Employers' Ass'n*, 825 F.2d at 1092–94 (union's insistence that employer accept standardized contract not in bad faith where contract not unrealistically harsh and union's behavior suggested that it maintained open, accessible position); *see also Inland Tugs*, 918 F.2d 1299. At the very least, the lack of external factors

would have presented the Board (and this court) with a more complicated task; when a determination must be made solely from proposals advanced and adhered to, the distinctions between lawful "hard bargaining" and unlawful "surface bargaining" are far from crystalline. *See id.* (citing *Eltec Corp.*, 286 N.L.R.B. 890, 893–97 (1987)); *Kankakee–Iroquois County Employers' Ass'n*, 825 F.2d at 1092–94; *Wright Motors*, 603 F.2d at 609–10.

Overnite's argument ignores the facts, however, by focusing solely on its behavior at the bargaining table. There is more to this case than bargaining stance; Edwards openly declared the company's unlawful intentions prior to the commencement of collective bargaining. And when those statements are viewed alongside Overnite's behavior at the bargaining table, there arises a fair inference that Overnite was not honestly and in good faith attempting to preserve uniformity among its terminals. In other words, Overnite was not "persuaded" because it never had any intention to be "persuaded"; the company was making good on a promise never to cooperate with the Union.

It is possible, of course, that Overnite changed its attitude and resolved to bargain in good faith after losing the election. Overnite has not made this argument, however. Indeed, it failed to contest *at all* the Board's assumption that Edwards's pre-election statements were highly relevant to the 8(a)(5) inquiry.[15]

Viewing the totality of the circumstances, as did the Board, we find ample support for upholding the Board's findings under the substantial evidence standard. *See* 29 U.S.C. § 160(e). These findings accurately portray the facts in the record and have not been challenged in any meaning-

---

**13.** *Kankakee–Iroquois County Employers' Ass'n v. NLRB*, 825 F.2d 1091, 1094 (7th Cir.1987) (quoting *NLRB v. Advanced Bus. Forms Corp.*, 474 F.2d 457, 467 (2d Cir.1973)); *see Inland Tugs*, 918 F.2d at 1307.

**14.** *Kankakee–Iroquois County Employers' Ass'n*, 825 F.2d at 1094 (quoting *Church Point Wholesale Grocery Co.*, 215 N.L.R.B. 500, 502 (1974), *aff'd sub nom. Oil, Chemical & Atomic Workers*

*Int'l Union, AFL–CIO v. NLRB*, 538 F.2d 1199 (5th Cir.1976)).

**15.** Overnite even appears to concede the relevance of Edwards's statements to a finding of bad faith bargaining. Its reply brief acknowledges that "alleged predictions of bad faith bargaining may somehow be relevant in an attempt to prove bad faith bargaining, and in that regard, be some evidence of employer intent."

ful way by Overnite. The company's argument does raise interesting questions, but it addresses a factual situation other than the one before this court.

### III.

For all of the aforementioned reasons, the Board's order is ENFORCED.